UNITED STATES of America, Appellee,

v.

Timothy PILARINOS,
Defendant–Appellant.

No. 88, Docket 88–1181.

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 1988.
Decided Dec. 21, 1988.

Marion Bachrach, New York City (Ronald E. DePetris, Seth F. Kaufman, Summit Rovins & Feldesman, New York City, of counsel), for defendant-appellant.

Alexandra Rebay, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Celia Goldwag Barenholtz, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before OAKES, MINER and ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Timothy Pilarinos appeals from a judgment of conviction entered after a five-day jury trial in the United States District Court for the Southern District of New York (Stanton, J.). Arrested for his participation in an undercover operation designed to identify taxpayers who bribe officials of the Internal Revenue Service ("IRS"), Pilarinos was charged with and convicted of (1) conspiring to violate the federal bribery laws, in violation of 18 U.S.C. §§ 201(b) (1982 & Supp. IV 1986) and 371 (1982) (Count One), and (2) bribing

an employee of the IRS, in violation of 18 U.S.C. § 201(b)(1) (1982 & Supp. IV 1986) and 18 U.S.C. § 2 (1982) (Count Two). He was sentenced to imprisonment for eighteen months and fined $20,000 on the conspiracy count; he received a suspended sentence, with a three year period of probation, on the substantive count. As a special condition of probation, the district court ordered Pilarinos to resolve any outstanding tax liabilities. Special assessments totalling $100 also were imposed.

On appeal, Pilarinos challenges the district court's instruction on entrapment, arguing that because the court foreclosed the jury from finding that the two middlemen in the undercover operation were government agents, he was denied a derivative entrapment defense. Pilarinos also contends that the district court erred in admitting into evidence a telephone conversation he claims occurred after the termination of the charged conspiracy. Because we find that neither the government nor the middlemen induced the defendant to pay the bribe, and that a statement made during the telephone conversation by defendant's agent was admissible, we affirm the conviction.

## BACKGROUND

From August 1984 to November 1986, the IRS conducted an undercover operation, in which IRS Inspector Harry Norman posed as a corrupt IRS employee who took bribes from taxpayers seeking to avoid tax liabilities. At the outset of the operation, Inspector Norman was introduced to co-conspirators Eleftherios Stavrakis, a Greek Orthodox priest and businessman, and Vasilios Apostolatos, an accountant. These two co-conspirators acted as middlemen in the operation: For each person they brought to Norman to have his or her taxes "fixed," Norman would share with Stavrakis one-half the bribe for federal tax matters and one-third the bribe for state matters, and would negotiate separately with Apostolatos a suitable arrangement.

On August 28, 1986, Stavrakis telephoned Norman and told him that he had a client, Pilarinos, who was willing to pay approximately four thousand dollars to stop a federal audit on a gas station owned by Pilarinos in Queens. The audit was limited to the year 1984 and involved potential tax liability initially thought to be only three-thousand to four-thousand dollars. On September 4, 1986, Norman met with Apostolatos, who told him that Pilarinos' father-in-law, who previously had bribed Norman on a tax matter of his own, had referred Pilarinos to Apostolatos.

Later that day, Norman met with Stavrakis and Pilarinos; this meeting was videotaped by the government. Pilarinos asserts that he is poorly educated and speaks only rudimentary English, and that his English rapidly deteriorated during the meeting. Pilarinos testified, however, that he understands English "80 percent." In any event, much of the conversation during the meeting took place in Greek and was translated, without objection by Pilarinos, into English for the benefit of Norman.

The transcripts of the meeting reveal that when Norman introduced himself to Pilarinos and mentioned that he was with the IRS, Pilarinos interrupted him, noting that his father-in-law already had familiarized him with the scheme, and that Norman did not have to explain anything further to him. Pilarinos thereafter turned the conversation to the amount of money that would be required as a bribe to stop the federal audit. Noting that he could stop it, Norman cautioned Pilarinos that to do so would be illegal and that Pilarinos would have to "take care of" him. Pilarinos responded approvingly, stating that "[n]obody works for nothing."

Concerned that the IRS might expand the scope of the audit to include other years and, perhaps, other matters, Pilarinos explained that, although his present excise tax liability was approximately $7,000, he wished to stop the audit even if it would cost him "a little more." He therefore agreed to pay $6,000 to "get it over with." Significantly, Pilarinos concedes on appeal that he was not induced by Norman to pay the bribe.

The other matters with which Pilarinos was concerned included both personal and

state sales taxes. For example, after estimating his excise tax liability, Pilarinos acknowledged his fear that the IRS would "dig up the other personal" matters, and that they surely would "find something," perhaps even "another seven thousand dollars." He also observed, regarding the bribe at issue, "[t]hat this one's for the federal," as distinguished from the state, taxes. Indeed, Pilarinos indicated to Stavrakis that he had a separate sales tax matter that could pose problems. As a result, Stavrakis told Norman during the meeting that Pilarinos had "other things that he want[ed] to take care [of] in the future," and that, after the federal audit was resolved, Pilarinos intended to return with more business. Pilarinos did not object to, but rather voiced approval of, the proposed future dealings with Norman.

At the district court, Pilarinos testified that when he met with Norman on September 4th, he thought that Norman was an accountant, despite the latter's assertion that he worked for the IRS; that Norman merely was to assist him in determining his tax liability, for a $6,000 fee, so that Pilarinos could pay the government what was due; and that he never heard Norman say that any payment made to stop the audit would be illegal. The government introduced evidence, in its rebuttal case, that on November 14, 1986, Stavrakis telephoned Norman and told him that earlier that day Pilarinos had called, stating that he had a state sales tax matter that he was willing to pay $20,000 to resolve.

The district court admitted into evidence Norman's testimony concerning the November 14th telephone call, pursuant to Fed.R.Evid. 801(d)(2)(E), as a statement made in furtherance of the charged conspiracy, finding that there was "ample evidence in the transcript and tape of the September conversation to show that the parties to the conversation specifically contemplated that there might be future transactions, falling within the ambit of the same arrangement." The court also concluded that this evidence was admissible under Fed.R.Evid. 404(b), because it bore on Pilarinos' intent to commit the crimes charged, and under Fed.R.Evid. 403, because its probative value outweighed its prejudicial impact.

Finally, the court charged the jury on entrapment, but with the following caution:

Your inquiry on this issue should first be to determine if there is any evidence that a government agent—here we are speaking of Mr. Norman, because Mr. Stavrakis and Mr. Apostolatos were not government agents—took the first step that led to a criminal act. If you find that there was no such act, there can be no entrapment and your inquiry on this defense should end there.

On appeal, Pilarinos contests this portion of the jury instruction because the question of whether the two middlemen were government agents was a matter for the jury to resolve, and that, by precluding the jury from considering this issue, the court "undermined" Pilarinos' derivative entrapment defense. Pilarinos also contends that the court erred in admitting Stavrakis' "uncorroborated, highly prejudicial hearsay statement" (i.e., the November 14th conversation), which implicated Pilarinos in another bribery scheme for an undefined tax problem. We affirm the judgment of conviction for the reasons that follow.

## DISCUSSION

### 1. Entrapment

The defense of entrapment requires, in part, that a defendant demonstrate that the government agent "induce[d] the accused to commit the offence charged in the indictment," *United States v. Mayo*, 705 F.2d 62, 67 (2d Cir.1983) (quoting *United States v. Sherman*, 200 F.2d 880, 882–83 (2d Cir. 1952)); *see generally Mathews v. United States*, —— U.S. ——, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). In limited situations, however, where "a person is brought into a criminal scheme after being informed indirectly of conduct or statements by a government agent which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly," *United States v. Valencia*, 645 F.2d 1158, 1168 (2d

Cir.1980), *aff'd after remand,* 677 F.2d 191 (2d Cir.1982).

A defendant is entitled to a derivative entrapment defense, therefore, when "the government's inducement was directly communicated to the person seeking [the] entrapment charge" by an unwitting middleman, *United States v. Toner,* 728 F.2d 115, 126–27 (2d Cir.1984); *see United States v. Buie,* 407 F.2d 905, 908 (2d Cir.) (derivative entrapment defense available "where government agents act through private citizens"), *aff'd,* 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969). Nevertheless, where a government agent "induces a middleman to commit a crime, and the middleman, responding to the pressure upon him, takes it upon himself to induce another person to participate in the crime," *Toner,* 728 F.2d at 127 (quoting *United States v. Myers,* 692 F.2d 823, 840 n. 13 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983)), the latter person is not entitled to a derivative entrapment charge.

█ Pilarinos contends that, because Norman entered into a fee-splitting arrangement with Stavrakis and Apostolatos, the government knew that these middlemen were recruiting potential bribers and, consequently, communicating the government's inducement to them. While it seems unlikely, in light of the fee-splitting arrangement, that Stavrakis or Apostolatos recruited Pilarinos "unbeknownst to" the government, *see United States v. Silvestri,* 719 F.2d 577, 579 (2d Cir.1983), we are not persuaded that Stavrakis and Apostolatos were government agents, or that the district court abused its discretion by not submitting the issue to the jury, *see Mayo,* 705 F.2d at 68 (quoting *United States v. Fleishman,* 684 F.2d 1329, 1342 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982)). Moreover, there is no evidence that Pilarinos was induced by the government to commit the crimes with which he is charged, or that either middleman communicated any such inducement to him.

Indeed, the record clearly establishes that Pilarinos was referred by his father-in-law to Apostolatos, and that he knew of the bribery scheme before he approached Apostolatos. Notably, neither Stavrakis nor Apostolatos initiated contact with Pilarinos; rather, Pilarinos sought the assistance of Apostolatos to arrange a meeting with Norman, and of Stavrakis to conduct the negotiations with Norman and act as the go-between to facilitate the actual payment of the bribe.

Additionally, the evidence does not support a conclusion that Stavrakis used "tactics of pressure, alarm and persistence" to coerce Pilarinos into paying the bribe so that Stavrakis could receive his share. To the contrary, Stavrakis expressly reserved for Pilarinos the ultimate decision whether, and how much, to pay Norman to stop the audit. Stavrakis suggested to Pilarinos during the course of the meeting that he pay a larger amount than originally intended; Pilarinos agreed to do so, however, because of his own fears that the government would expand the scope of its investigation. Even if Stavrakis did induce Pilarinos to pay a larger sum, Pilarinos undoubtedly came to the meeting with the intent to pay a bribe.

## 2. *The State Sales Tax Matter*

█ The district court admitted Norman's testimony regarding his November 14th telephone conversation with Stavrakis, pursuant to Fed.R.Evid. 801(d)(2)(E), finding that the state sales tax matter fell "within the ambit of" the charged conspiracy, and Fed.R.Evid. 403 and 404(b). Rule 403 deals with the exclusion of prejudicial or cumulative evidence, and Rule 404(b) deals with the limited *purposes* for which evidence of other crimes or wrongs is received. Neither serves as a basis for the admission of the telephone conversation. Moreover, it is questionable whether the conversation was held during the course of and in furtherance of a conspiracy as required by Rule 801(d)(2)(E). We are persuaded, however, that the evidence properly was admissible as a statement by a party's agent under Fed.R.Evid. 801(d)(2)(D). As we have noted, this Court may "uphold the admission on any theory

which finds support in the record, regardless of the ground relied on by the trial court," *United States v. Lieberman,* 637 F.2d 95, 103 n. 11 (2d Cir.1980); *see generally Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 157–58, 82 L.Ed. 224 (1937).

Rule 801(d)(2)(D) permits the introduction into evidence of a statement by a party's agent "concerning a matter within the scope of the agency ... made during the existence of the relationship." In the instant case, the record is replete with evidence that Stavrakis was to be Pilarinos' agent, at the September 4th meeting and in future negotiations as well. Stavrakis originally contacted Norman on behalf of Pilarinos on August 28, 1986. At the September meeting, Norman agreed to "deal through Father [Stavrakis]," and Stavrakis added that "everything happens with me" as he negotiated for Pilarinos with Norman.

The record also would support a finding that the sales tax matter was "within the scope of the agency" and that Stavrakis' conversation with Norman occurred "during the existence of the [agency] relationship." The telephone conversation alluded to the "future transactions" that Pilarinos specifically contemplated during the September 4th meeting. At that meeting, Pilarinos repeatedly referred to other state and personal tax liabilities, indicating that for these Stavrakis and he would return to Norman for assistance. Furthermore, there is no indication in the record that Pilarinos terminated the relationship with Stavrakis, or that the latter's conversation with Norman exceeded the scope of the agency.

Pilarinos mistakenly suggests that Stavrakis' conversation with Norman was admitted to prove a separate, uncharged conspiracy. The conversation, however, was not submitted to the jury as evidence of either the charged or a subsequent conspiracy, but rather as evidence to rebut Pilarinos' contention that he did not intend to bribe Norman to halt the federal audit. *See* Fed.R.Evid. 404(b). The district court went to great lengths, when the evidence was admitted and during the final charge, in instructing the jury on this issue: "[L]et me remind you that the defendant is not on trial for anything he may have said in November, and you may not consider this evidence as a substitute for proof that the defendant committed the crimes charged in September and October." Instead, the jury was instructed to consider the conversation "only for its possible bearing on [Pilarinos'] intent."

Even if the district court erred in admitting the statement, the error was harmless in light of the "overwhelming evidence of guilt," *United States v. Lyles,* 593 F.2d 182, 196 (2d Cir.) (quoting *United States v. Corey,* 566 F.2d 429, 432 (2d Cir.1977)), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *accord United States v. Castro,* 813 F.2d 571, 577 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987).

CONCLUSION

The judgment of the district court is affirmed.