**356**

UNITED STATES, Appellee,

v.

Sidney P. COOPER, Sergeant First
Class, U.S. Army, Appellant.

No. 65,924.
CM 8902034.

U.S. Court of Military Appeals.

Argued July 9, 1991.

Decided Sept. 30, 1991.

For Appellant: *Captain James M. Heaton* (argued); *Lieutenant Colonel Russell S. Estey* (on brief); *Major Michael J. Kelleher* and *Captain Brian D. Bailey.*

For Appellee: *Captain Timothy J. Saviano* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Major Thomas E. Booth, Captain Kenneth T. Grant* (on brief).

*Opinion*

COX, Judge:

Agents of the Criminal Investigation Command (CID) initiated sting operations to clean-up a drug ring purportedly operating within its own headquarters.[1] Towards this end, CID agents engaged the assistance of Rodney Powell, a known cocaine addict, who had previously worked at the headquarters as a driver for the CID commander.[2] The agents sought information from Powell because of his knowledge of drug use within the facility. Once onboard as a registered source, Powell divulged the names of five persons who he knew had sold drugs at the facility in question while he was there. Appellant's name was included.

Appellant, a recovering cocaine addict, was enrolled in the Army's Alcohol and Drug Abuse Prevention and Control Program (ADAPCP) when Powell identified

---

1. So far as the record reveals, no CID agents were involved in this drug activity.

2. Powell left the Army months earlier under honorable conditions. However, his drug addiction soon left him unemployed and penniless. As a desperate effort, he submitted enlistment papers to Army recruiters, lying about his

drug abuse. In or about November of 1988, authorities arrested Powell for stealing his girlfriend's television set, which he had pawned to get money for his cocaine dependence. It was at this point that CID learned of Powell's situation and considered the possibility of getting his assistance in breaking the drug ring.

him to CID.[3] Powell then contacted appellant, asking if he knew where he (Powell) could get some drugs. Appellant responded negatively, stating he was not "using" drugs and was not "doing anything else." However, Powell continued calling. He testified that he told appellant, "I had this white boy that had some money and wanted to sell some, and I didn't know where to get any from, and did he know?" Appellant finally agreed to help Powell.

A meeting was set. On December 2, 1988, appellant led Powell and an undercover CID agent to a crack house. Once at the house, appellant entered and purchased the drugs and gave them to the undercover CID agent. The same sequence of events took place on December 5, 1988.

Appellant pleaded not guilty to the Charge and its two specifications of cocaine distribution, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a, but he did not dispute his role in the distribution of the drugs. Instead, his strategy placed the Government on trial by arguing that he was enticed back to the world of drugs when he was most vulnerable because of his rehabilitation. He raised the defense of entrapment. In addition, appellant asserted that the action taken by Powell and the CID violated Army and CID regulations governing participants in the ADAPCP. Army Regulation (AR) 600–85, Personnel—General: Alcohol and Drug Abuse Prevention and Control Program (21 October 1988, effective 21 November 1988); AR 195–2, Criminal Investigation: Criminal Investigation Activities (30 Oct.1985 Update). However, appellant's position proved futile; the members found him guilty of both specifications of distributing cocaine. The Court of Military Review affirmed the findings and sentence[4] in a short-form opinion dated November 5, 1990.

Appellant challenges his conviction on two fronts. First, he claims that he was denied due process of law because government agents solicited his involvement in the crimes while he was in the ADAPCP. Second, he asserts that the Government failed to overcome appellant's entrapment defense. We decide both questions adversely to appellant.

### Due Process

Appellant's due process claim arises out of language in paragraph 3–7, AR 195–2, which states:

In compliance with the Army's ADAPCP policy, CID will investigate participants in ADAPCP for controlled substance of-

---

3. Appellant's story is a sad commentary on the lure and addictive nature of cocaine, and specifically crack cocaine. Appellant described the addictive lure of the drug as follows:

It—it's—it's hard to explain. If you take every Christmas, every Fourth of July, every New Year's, every orgasm that you've ever[ ]had in your entire life and multiply it several thousand times and then cram it into your body in an instant, that was [the] pleasure of cocaine—crack cocaine.

Crack cocaine ruled appellant's life; his wife left him; sleep was short and far between; and his automatic teller card financed an addiction that depleted his savings account.

This behavior persisted until appellant found himself one morning on the floor of a "crack house" in Washington, D.C. He had smoked an entire paycheck on a crack cocaine binge. At this low point, he turned for help. He sought out the drug-rehabilitation center at Fort Myer, Virginia. There he requested treatment and was accepted into the Army's Alcohol and Drug Abuse Prevention and Control Program (ADAPCP).

The program lasted 6 months, on an out-patient basis. Appellant attended daily counseling sessions and nightly meetings of Narcotics Anonymous. Family and friends rallied to his assistance: His older brother, an Air Force officer, took 30 days' leave to help appellant overcome his addiction. However, all efforts failed. From the time appellant entered the ADAPCP, he came-up positive on all ten drug tests conducted on him through September 6, 1988.

On September 9, 1988, appellant was transported to the Navy drug-treatment center in Miramar, California, which consisted of 6 weeks of intensive in-house treatment. Finally attaining success, appellant returned home at last able to resist crack cocaine. His treatment continued at home, at Fort Myer, on an out-patient basis. Since appellant's return from Miramar, all eleven drug tests had been negative.

4. Appellant was sentenced to a dishonorable discharge and 5 years' confinement. The sentence was approved by the convening authority on October 11, 1989.

fenses only if the offense occurred after entry into the program or if the participant had been identified as a suspect or subject prior to the time of entry into the program. Participants in ADAPCP will not be knowingly approached by CID special agents for the purpose of soliciting information about controlled substances distribution unless the participant voluntarily offers to provide such information. (*See* AR 600–85).

Thus, the sole question we must decide is whether a special agent of the CID *knowingly* approached appellant and got him involved in this transaction in violation of Army regulations. After consideration of the evidence, the military judge found

[t]hat the CID did not know that the accused was in any sort of rehabilitation program until AFTER he had been targeted as a possible source of the distribution of drugs.

There is ample evidence of record to support the factual findings of the military judge; hence they should not be disturbed on appeal. *United States v. Burris*, 21 MJ 140 (CMA 1985).

Appellant also frames his due-process argument in terms of equity or fundamental fairness, claiming that the adventure presented by the facts of this case corrupts the underlying purposes of the Army drug rehabilitation program. There are two regulations in question: (1) AR 600–85, Personnel—General: Alcohol and Drug Abuse Prevention and Control Program; and (2) AR 195–2, Criminal Investigation: Criminal Investigation Activities. Both regulations contain language prohibiting government agents [5] from "soliciting information" from participants in the ADAPCP. Para. 3–7, AR 195–2; *see* para. 2–16*a*, AR 600–85. Both regulations are designed to encourage drug abusers to come forward and seek help for their problems and offer a great deal of protection to the servicemember who avails himself of the opportunity to overcome drug related problems.

If we were convinced that the CID knowingly sought out a member who was in the program for the purpose of setting him up for a subsequent arrest, then clearly we would have to find that a violation of due process occurred. But that is not the case here.

Many factors lead to this conclusion. First, Powell, the informant, and appellant (during the days of their drug addiction) used drugs, and each would often purchase drugs for the other. Moreover, it is quite obvious that the CID was not using appellant's participation in the drug rehabilitation program to force him to give them information inculpating other drug users. Powell, the informant, was given a free hand to try to catch persons distributing drugs. The record does not support a conclusion that Powell overreached to encourage appellant to do anything that appellant was not already willing to do and had done frequently in the past.

With only a little prompting, appellant agreed to a meeting with Powell and the undercover CID agent; he took the pair to a crack house; he entered the crack house; he negotiated the sale of 11.6 grams of cocaine; he purchased the cocaine along with 18 small ziplock-style plastic bags; and he delivered it to the undercover CID agent. This same sequence of events occurred on December 5, 1988, with 13 grams of cocaine and 26 small ziplock bags being purchased and delivered by appellant. Moreover, driving home after the second transaction, appellant mentioned the possibility of receiving compensation for his services.

It is not the purpose of drug rehabilitation programs to provide a safe harbor for those who continue to engage freely and voluntarily in subsequent criminal activity.

---

5. Our use of the term "government agent" is generic for the personnel described by the regulations. Both regulations identify "USACIDC special agents and other investigative personnel, to include sources" as government agents.

Para. 2–5b(5), Criminal Investigation Command Regulation 195–15; *see* para. 2–16*a*, AR 600–85. For purposes of this opinion, both the CID agent and registered source are government agents.

## Entrapment Defense

Appellant also contends that he was lured into the distribution by the government agents when he had no predisposition to do so otherwise. Under RCM 916(g), Manual for Courts–Martial, United States, 1984, "[i]t is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense."

Once an accused raises the defense of entrapment, the Government bears the burden of proving beyond a reasonable doubt that the accused was predisposed to commit the crime and merely needed the opportunity. The resolution of the issue is then left for the factfinder.[6] *United States v. Vanzandt*, 14 MJ 332, 343 (CMA 1982).

Therefore, we must decide whether the Government presented sufficient facts to overcome appellant's entrapment defense. It clearly did. The CID asked an informant to supply names of persons who might be targeted as drug dealers. The informant gave the CID appellant's name. The informant called appellant seeking his help in finding drugs for an unknown third party. Although initially appellant indicated his reluctance to get involved, he nevertheless jumped into the adventure with zeal and success.

The defense was submitted to the court members with proper instructions, and the members rejected it. Panel members, during *voir dire*, were questioned concerning entrapment. Defense counsel's opening statement prepared and educated the members on entrapment, and he solicited testimony from witnesses pertaining to whether appellant was entrapped. Defense counsel's closing argument talked of entrapment, and the military judge instructed the members on entrapment. The members were thoroughly versed on the defense of entrapment; from the moment of their selection to the judge's final instructions, they knew of the defense. Our review of the record reveals nothing that would lead this Court to determine that, as a matter of law, the Government failed to meet its burden of proving beyond a reasonable doubt that appellant was not entrapped.

The decision of the United States Army Court of Military Review is affirmed.

SULLIVAN, Chief Judge (concurring in the result):

I do not agree with the lead opinion's suggestion that this case can be resolved on the basis of the government agent's lack of knowledge of appellant's status as a patient in a service drug-rehabilitation program. That agent's informant knew appellant was in such a program, and the Government cannot disavow its informant's knowledge. *See Sherman v. United States*, 356 U.S. 369, 375, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958).

In any event, I do not agree with the lead opinion's application of service regulations to this case either. Paragraph 3–7, Army Regulation 195–2 (30 Oct.1985), cited by Judge Cox, does not apply to offenses occurring after entry into the program. Moreover, the prohibited conduct in that section of the Army Regulations is the gathering of information, not the conducting of a "sting" operation.[1] Construed in

---

6. Where the defense is one of denial of due process, the military judge must make the determination. *United States v. Vanzandt*, 14 MJ 332, 343 (CMA 1982). However, this does not apply here because there was reasonable suspicion on the part of the government agents prior to the sting operation taking place.

1. Paragraph 2–5b(5), Criminal Investigation Command Regulation 195–15 (1 Nov.1987) states:

(5) The Alcohol and Drug Abuse Prevention and Control Program (ADAPCP) prohibitions and restrictions are defined in AR 600–85.

USACIDC special agents and other investigative personnel, to include sources, will not solicit information from participants in ADAPCP. Information which is volunteered is acceptable, as long as it is not obtained within an ADAPCP facility or in such a manner as to jeopardize the safety of the source or in a way which compromises the credibility of the ADAPCP. No covert agents will enroll or infiltrate ADAPCP facilities for the purpose of law enforcement activities. The USACIDC special agent must know if their open/confi-

this light, the criminal investigator committed no regulatory violation.

Also, I am not persuaded that any applicable civilian[2] or military regulation[3] on federally assisted drug-treatment programs "proscribes sting operations against drug rehabilitation patients," as the defense contends. Appellant cites no particular statute or regulation for this prohibition, and I have discovered none on my own. The regulations do proscribe placement of informants in these programs, and use of information gathered by informants or undercover agents against the patients of such a program. However, these regulations cannot be reasonably construed to give patients immunity for post-entry drug offenses observed and participated in by government agents or informants.

Finally, appellant was found guilty of wrongfully distributing cocaine on two separate occasions—December 2 and 5, 1988, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. At that time he was receiving out-patient treatment for his cocaine addiction at Fort Myer, Virginia. If the government informant had preyed on appellant's addiction to induce him to commit the crime of *using*

---

dential/registered source(s) are ADAPCP participants.

2. According to § 2.17, 42 C.F.R. Ch. 1 (10-1-90 Edition):

§ 2.17 Undercover agents and informants.
(a) *Restrictions on placement.* Except as specifically authorized by a court order granted under § 2.67 of these regulations, no program may knowingly employ, or enroll as a patient,any undercover agent or informant.
(b) *Restriction on use of information. No information obtained by an undercover agent or informant, whether or not that undercover agent or informant is placed in a program pursuant to an authorizing court order, may be used to criminally investigate or prosecute any patient.*
[52 FR 21809, June 9, 1987; 52 FR 42061, Nov. 2, 1987]
(Emphasis added.)

3. Army Regulation (AR) 600-85, Personnel-General: Alcohol and Drug Abuse Prevention and Control Program (21 Oct.1988) provides:

2-16. Law enforcement relationship to the ADAPCP

---

*cocaine,* my judgment would be different in this case. *See generally Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Distribution of drugs ultimately for a stranger for possible profit, however, is an entirely different matter, and a sting operation against the same is not patently outrageous government conduct. *See United States v. Luttrell,* 889 F.2d 806, 811-14 (9th Cir.1989).

**EVERETT, Senior Judge (dissenting):**

Judge Cox states that "the sole question we must decide is whether a special agent of the CID *knowingly* approached appellant and got him involved in this transaction in violation of Army regulations." In response to this question, he recites a finding by the military judge "[t]hat the CID did not know that the accused was in any sort of rehabilitation program until AFTER he had been targeted as a possible source of the distribution of drugs." Concluding that "[t]here is ample evidence of record to support [this] factual finding[ ] of the military judge," Judge Cox impliedly answers the question, "No." 33 MJ at 358.

---

*a.* It is Army policy to encourage voluntary entry into the ADAPCP. Military police, Criminal Investigation Division (CID) special agents,and other investigative personnel will not solicit information from clients in the program, unless they volunteer to provide information and assistance. If the client volunteers, the information will not be obtained in the CCC [Community Counseling Center] or in such a manner as to jeopardize the safety of sources of the information or compromise the confidentiality and credibility of the ADAPCP (AR 190-30 and 195-2).
*b.* Title 42, Code of Federal Regulations, prohibits undercover agents from enrolling in or otherwise infiltrating an alcohol or other drug treatment or rehabilitation program for the purpose of law enforcement activities. This restriction does not preclude the enrollment in the ADAPCP, for rehabilitation purposes, of military police, CID, or other investigative personnel who have an actual alcohol or other drug abuse problem. Their law enforcement status must be made known to the ADCO at the time of their enrollment. These measures are for the protection of the law enforcement client as well as the ADAPCP.
(Emphasis added.)

The lead opinion errs, however, by phrasing the question too narrowly and, consequently, errs as well in its answer.

### I

In the view of many, illegal drugs is the single most serious law-enforcement problem facing governments at all levels today. Drug abuse is a killer: It kills bodies; it kills spirit; it kills imagination; it kills love. It is not hyperbolic to call the drug epidemic in this country a human and social tragedy. Appellant's personal downfall, summarized in footnote 3 of the lead opinion, is all *too common*.

Law-enforcement efforts, however, are not enough, alone, to remedy this sickness. We cannot—and we do not—give up on the lives and souls of those whose addictions own them; we can—and we do—put huge efforts into helping the helpless regain control of their own destinies. This not only is the morally right thing to do, but also it is socially beneficial.

Rehabilitation of a drug addict is extremely difficult. The physical and psychological torment that the addict experiences is a personal hell that, I am confident, cannot be fully appreciated by anyone who has not suffered the experience. It is, as well, a fragile process—one that is not without inherent steps backward and one that easily can be frustrated by outside influences.

To help remove some extraneous factors that might make rehabilitation all but impossible, Congress mandated confidentiality with respect to patients' participation in any federally assisted drug-treatment program. *See* 42 USC § 290ee–3(a). This confidentiality extends even to generally proscribing use of records of program patients "to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient." 42 USC § 290ee–3(c). It is thus clear that, in the conflict that sometimes arises between law-enforcement and genuine rehabilitation efforts, Congress conceptually has protected the latter even at the limited expense of the former.

Following this lead, the Army has imposed reasonable self-restraint on its law-enforcement activities in order to protect the hoped-for success of its rehabilitation effort under the Alcohol and Drug Abuse Prevention and Control Program (ADAPCP). For instance, paragraph 2–16a of Army Regulation (AR) 600–85, Personnel—General: Alcohol and Drug Abuse Prevention and Control Program (21 Oct. 88), states:

> It is Army policy to encourage voluntary entry into the ADAPCP. Military police, Criminal Investigation Division [sic] (CID) special agents, and other investigative personnel will not solicit information from clients in the program, unless they volunteer to provide information and assistance.

Also, paragraph 2–16b of this same regulation recognizes:

> Title 42, Code of Federal Regulations, prohibits undercover agents from enrolling in or otherwise infiltrating an alcohol or other drug treatment or rehabilitation program for the purpose of law enforcement activities.

*See* n. 2 of the Chief Judge's separate opinion.

In the same vein, paragraph 3–7, AR 195–2, Criminal Investigation: Criminal Investigation Activities (30 Oct 85), charges:

> In compliance with the Army's ADAPCP policy, CID will investigate participants in ADAPCP for controlled substance offenses only if the offense occurred after entry into the program or if the participant has been identified as a suspect or subject prior to the time of entry into the program. Participants in ADAPCP will not be knowingly approached by CID special agents for the purpose of soliciting information about controlled substances distribution unless the participant voluntarily offers to provide such information.

Even more pointedly, paragraph 2–5b(5), CID Regulation 195–15, Criminal Investigation: USACIDC Source Program (1 Nov. 1987), asserts:

The Alcohol and Drug Abuse Prevention and Control Program (ADAPCP) prohibitions and restrictions are defined in AR 600–85. USACIDC special agents and other investigative personnel, to include sources, will not solicit information from participants in ADAPCP. Information which is volunteered is acceptable, as long as it is not obtained within an ADAPCP facility or in such a manner as to jeopardize the safety of the source or in a way which compromises the credibility of the ADAPCP.

## II

This regulatory approach toward safeguarding the integrity of ADAPCP may fairly be summarized as follows: If an ADAPCP patient has been identified as a drug suspect prior to his entry into the program, the investigation may continue; additionally, law-enforcement efforts may be pursued to investigate any suspicion of illegal drug activity that occurs after the patient is enrolled in the program. As the lead opinion puts it, "It is not the purpose of drug rehabilitation programs to provide a safe harbor for those who continue to engage freely and voluntarily in subsequent criminal activity." 33 MJ at 358.

Other than these caveats, however, ADAPCP participants are to be left alone, free from any government contacts that might well frustrate the successful rehabilitation of the patient. Any action that might psychologically lure a flawed and vulnerable addict back into the environment he is trying so mightily to shun is morally reprehensible and legally proscribed.

In my view, that is what happened here. To clear up a perceived drug problem in the very office building that housed the headquarters of the Army's Criminal Investigation Command, CID agents approached Powell and offered him assistance in a variety of ways; in return, Powell was to furnish the agents the names of five people in the building who were "dealing drugs." Powell submitted appellant's name as one of the five.

Appellant came to Powell's mind because the two of them had, in the past, used cocaine together. Powell candidly admitted at trial, however, that he had no knowledge at all that appellant ever had sold drugs. When asked why he had said appellant was a seller when that was not true, he answered:

A: Because of the position I was in.

Q [DC]: What position were you in?

A: I was trying to, I guess, run away from my problems and get [back] in the Army, but I had these charges hanging over my head that they [the CID agents] said they could get rid of. They told me that if I produced some names and helped them get, I think it was, they came up—they said like five people, then they would squash the charges. So I was coming up with some names.

Not only did Powell know, at least to the extent of their relationship, that appellant was not a drug dealer, but Powell also knew that appellant was in a drug rehabilitation program—and he knew it in the first moments of his initial telephone conversation with appellant. While Agent Duperron, Powell's contact, could not "recall" whether Powell had told him early on about appellant's rehabilitation participation, he acknowledged that Powell "could have" told him that.

In any event, the record makes clear that Powell, acting as a source and informant for the CID, falsely identified appellant to the CID as a drug dealer, knowing of appellant's participation in a drug rehabilitation program. Additionally, Powell may even have told Agent Duperron of this participation. Thereafter, Powell made contact with appellant, while the latter was in the program, urging him to do something that, so far as Powell knew, appellant never had done before: distribute drugs.

Assuming, for present purposes, that Powell did not tell his handler, Agent Duperron, about appellant's program participation, the Government cannot escape the taint associated with Powell's own knowledge of this participation. "The Govern-

ment cannot make such use of an informer and then claim disassociation through ignorance." *Sherman v. United States*, 356 U.S. 369, 375, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958). *See* para. 1–2d, CID Reg. 195–15 ("Registered sources are always considered agents of the Government.").

It is this last point that is the flaw both in the military judge's finding and in the lead opinion. In looking to see what the CID did or did not know, the military judge failed to consider Powell as *part* of the CID for this purpose; in my view and based on the authority just cited above, he erred in that regard. Similarly, in limiting the "sole question" to "whether a special agent of the CID ... approached appellant" while having the knowledge that appellant was a participant in a drug rehabilitation program, Judge Cox inappropriately excludes Powell—an informant and registered source—from the scope of his inquiry.

As the lead opinion quite aptly states, "Powell, the informant, was given a free hand to try to catch persons distributing drugs." 33 MJ at 358. Obviously, he had *too* free a hand! The Government cannot turn loose a desperate drug addict as an informant and then later seek to shield itself from responsibility for his actions and his knowledge.

The fact of the matter is that, in contravention of both the spirit and the letter of the drug-rehabilitation-program concept and in contravention of Army-wide and CID regulations, appellant was approached by the CID while he was a rehabilitation patient and lured back into the drug environment that he had spent countless hours trying to shirk and that the government had spent countless hours and dollars helping him shirk. This was unlawful and immoral, to say nothing of plain stupid.

Accordingly, I dissent.