**UNITED STATES**

v.

**Dale R. KEMP, 076–64–8164, Interior Communications Electrician Fireman (E–3), U.S. Navy.**

**NMCM 93 02470.**

U.S. Navy–Marine Corps
Court of Criminal Appeals.

Sentence Adjudged 27 Feb. 1992.

Decided 31 July 1995.

---

LT B.C. Lansing, JAGC, USNR, Appellate Defense Counsel.

LT Philip Sundel, JAGC, USNR, Appellate Defense Counsel.

Capt J.F. Havranek, USMC, Appellate Defense Counsel.

LtCol Frank F. Krider, USMCR, Appellate Government Counsel.

LT David K. Herlihy, JAGC, USNR, Appellate Government Counsel.

LT Jonathan W. Haray, JAGC, USNR, Appellate Government Counsel.

Before LARSON, C.J., WELCH, Senior Judge, and McLAUGHLIN, J.

WELCH, Senior Judge:

The appellant claims, *inter alia*, that the evidence establishes the affirmative defense of "vicarious or derivative" entrapment. Whether this variation of the traditional defense of entrapment exists in military law is a question of first impression. We need not answer the question in this case because we find that the appellant was predisposed to commit the relevant offenses. Thus, he was not entitled to an acquittal under either theory of entrapment.

We conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights was committed. We discuss below the assignments of error [1] and the specified issue.[2]

## I. Introduction

After pleading not guilty to all charges, the appellant was convicted at a general court-martial of (a) unlawfully selling a Naval Firefighter Thermal Imager [NFTI] of a value of $16,650.00 and a gas detector of a value of $1,200.00, military property of the United States, to an undercover agent of the Naval Criminal Investigative Service [NCIS], in violation of Article 108, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 908, and (b) stealing the above mentioned NFTI, in violation of Article 121, UCMJ, 10 U.S.C. § 921. He was found not guilty of two other alleged offenses. The offenses occurred on 29 and 30 August 1991 in Norfolk, Virginia,

when the appellant was a member of the crew of USS GUNSTON HALL (LSD 44), the ship from which the NFTI and gas detector were stolen.

The military judge who tried the appellant sentenced him to confinement for 6 months, reduction to pay grade E–1, forfeitures of $600.00 pay per month for 6 months, and a bad-conduct discharge. The convening authority approved the findings and sentence, but suspended the bad-conduct discharge for 10 months from the date of the convening authority's action.

## II. Factual Setting

The appellant's confession succinctly states the basic facts:

I helped David Luke steal a thermal imager known ... as a NIFTY from my ship. ... Luke used my bag, went into repair locker number two and stole the NIFTY. I watched while outside the locker to make sure no one was watching. Luke and I had a coded knock as to when it was safe for Luke to come out of the locker. ... Luke also stole an oxygen tester before the NIFTY but I do not recall when he did it. ... I did not steal nor was I present when Luke stole the oxygen tester.

The next day me and Luke met a man ... [whom] I now know as Special Agent Mark Cranfill. ... During the meeting me and Luke sold Special Agent Cranfill the NIFTY and oxygen tester for $475. I split the money with Luke. ... An individual by the name of HT [B] introduced me to Cranfill.

Prosecution Ex. 16. The confession was corroborated by other evidence summarized below.

The appellant was assigned to USS GUNSTON HALL in May 1990. He met DCFR Luke when both men were on mess duty

1. I. THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION FOR CREDIT FOR ILLEGAL PRETRIAL CONFINEMENT.

II. THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT WAS NOT ENTRAPPED. (Footnote omitted.)

III. APPELLANT'S SENTENCE IS INAPPROPRIATELY SEVERE FOR THESE OFFENSES. (Footnote omitted.)

2. DOES THE EVIDENCE PROVE BEYOND REASONABLE DOUBT THAT THE APPELLANT WAS NOT INDIRECTLY OR VICARIOUSLY ENTRAPPED BY A MIDDLEMAN, HIS FRIEND DCFR LUKE? (Citations omitted.)

within approximately 30 days of the appellant's arrival on the ship. The appellant described his relationship with Luke on the day they stole the NFTI, 29 August 1991, as follows: "He was someone on the ship I knew. I worked with him. We were friends." Record at 193.

On 29 August 1991, the appellant and Luke talked about going ashore to the Navy Exchange. The appellant told Luke that he would like to buy some dungarees for an inspection the next day. The next day was payday and the appellant had very little money. He asked Luke if he could borrow money from him. Luke offered to help him with some money. They went off the ship together. At Luke's request, the appellant provided him a bag from the appellant's berthing area. The appellant thought Luke wanted to put laundry in the bag. Luke put something in the bag while around the corner from Repair Locker 2. The appellant did not see what Luke put in the bag, but on cross examination, he conceded that he did suspect that "maybe something was a little shaky." Record at 192–95, 205.

After the men left the ship, Luke told the appellant that he had to meet someone to get money so they could go to the exchange. When the appellant asked Luke about his plans, Luke said he was meeting someone to sell a piece of firefighting equipment. On the way to Rose's Department Store, Luke told the appellant he had the firefighting equipment with him. The people Luke was to meet did not show up. Luke wanted to wait for them. At that time, it was clear to the appellant that Luke got money from selling stolen gear. They met some friends and walked on base to a game room, where Luke said four or five times that he wanted to go back to the ship. On the way back to the ship, Luke told the appellant he was going back to the ship to steal the NFTI and he wanted the appellant to help him steal it. Record at 197–98, 205.

Luke asked the appellant if he would stand lookout while Luke stole the NFTI from the ship. Record at 114, 198. The appellant was reluctant for a moment, not saying "yes" or "no," but he agreed to help when Luke offered him $20.00. Record at 198. The appellant knew that Luke was planning to sell the NFTI after stealing it. Record at 114. After the appellant agreed to be the lookout, Luke offered him the opportunity to back out of their plan, telling the appellant, "You don't have to, you know, because it is dangerous, but you know, I would like your help." Record at 114.

After they returned to the ship, the appellant acted as a lookout when Luke entered a repair locker to get the NFTI. The appellant then carried the NFTI from the ship concealed in a duffle bag. Record at 115–16, 198. Later, on 30 August 1991, the appellant attended a meeting that had been arranged to sell the NFTI and actively participated in negotiating a price. Record at 117–18; Prosecution Ex. 15. He went there expecting to get $50.00 from Luke, the amount Luke had promised to give him when they walked from the ship with the NFTI. Luke soon raised the amount because he seemed bothered by only giving the appellant $20.00. Record at 200, 213. The appellant ultimately received $75.00 for his part in these offenses. Record at 118.

On cross-examination, the appellant replied affirmatively to the question "[a]nd what it took to buy your participation in this was an offer of $20.00, right?" Record at 206. Later, he acknowledged that he was, at the time, willing to risk a felony conviction for $20.00, but that he did not want to make any more than that. Record at 207. However, he also acknowledged that he would have been enthused if the offer had been for $500.00. Record at 208.

During the pre-sentencing stage of the trial, the appellant was asked by his defense counsel what his primary motivation in acting as a lookout was. The appellant replied under oath, "[m]oney." Record at 243. He then added that another motivation was "[t]o try to build a friendship with Luke." Id.

Prior to the theft, HTFN [B], a Government informant aboard USS GUNSTON HALL, was instructed by NCIS agents to look out for possible criminal activity. Record at 39. In doing so, B admitted that he targeted Luke as possibly being susceptible to criminal activity. Record at 169, 175.

Consequently, B suggested to Luke that he might steal items from the ship and sell them to a buyer whom B knew. Record at 123–24, 172. On 26 August 1991, Luke and B met with undercover Special Agent Cranfill. Record at 98; Defense Ex. B. The appellant was not specifically targeted by B because he did not seem to "fit the bill." Record at 176.

The appellant was brought into this scheme by Luke, who asked the appellant to act as a lookout while he stole firefighting equipment. Record at 114, 198. Neither B nor any of the NCIS agents involved had any idea that the appellant was involved in thievery until after the appellant and Luke stole the NFTI. Record at 79, 156. Neither B nor the NCIS agents ever instructed Luke to enlist the aid of a partner. However, at one point, Special Agent Cranfill asked Luke if he had a partner. According to Special Agent Cranfill, he asked the question to make sure that any partners could be trusted. Record at 129. The agent gave Luke a card with his telephone number on it. Record at 63. Luke testified that during the same conversation, the agent told him, "Don't bring me anyone like Dale," possibly referring to the appellant. Record at 129.

At 0930, 24 September 1991, the appellant was apprehended by NCIS special agents; at 1130, he signed a sworn statement admitting his role in the larceny and sale of military property. At 1330, the Commanding Officer, USS GUNSTON HALL, ordered the appellant confined. On 30 September 1991, an initial review officer determined after a hearing per Rule for Courts–Martial [R.C.M.] 305 that the appellant should remain confined. The military judge denied the appellant's motion for appropriate relief based on alleged illegal pretrial confinement. Appellate Exs. X and XI.

### III. Alleged Illegal Pretrial Confinement

In *United States v. Rexroat*, 38 M.J. 292 (C.M.A.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1296, 127 L.Ed.2d 648 (1994), the United States Court of Appeals for the Armed Forces held (a) that the 48–hour time limit for the initial probable cause review of pretrial confinement imposed by *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), is applicable to

the military service, and (b) that either the unit commander's initial determination of probable cause in accordance with R.C.M. 305(d) or the review of pretrial confinement in accordance with R.C.M. 305(h) can satisfy the requirements of *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), if the commander qualifies as a neutral and detached magistrate. *See also United States v. McLeod*, 39 M.J. 278 (C.M.A.1994) (finding no evidence that the officers approving pretrial confinement were "directly or particularly involved in the command's law enforcement function").

■ We find no evidence in this case that the Commanding Officer, USS GUNSTON HALL was "directly or particularly involved in the command's law enforcement function" when he authorized the appellant's pretrial confinement on 24 September 1991. *Id.* at 278. Thus, based on the above cited cases, we hold that the appellant was not subjected to illegal pretrial confinement. His unit commander's initial determination of probable cause in accordance with R.C.M. 305(d) satisfied the requirements of *Gerstein v. Pugh*. The first assignment of error is without merit.

### IV. Vicarious Entrapment

On 15 January 1992, Luke was tried by a general court-martial. Due to entrapment, he was acquitted.

The appellant asserts, as he did at trial, that he was induced to commit offenses by and through Luke, his entrapped partner, who acted as a conduit for illegal Government inducement. Such third-party inducement has been referred to in Federal courts as vicarious, indirect, or derivative entrapment. *See* Note, *Entrapment Through Unsuspecting Middlemen*, 95 Harv.L.Rev. 1122 (1982); *United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir.1994). To keep matters simple, we will refer to this concept as "vicarious entrapment." The appellant also maintains, as he did at trial, that he had no predisposition to commit the offenses charged.

Both the Government and the appellant agree that military jurisprudence has not

clearly recognized vicarious entrapment. The appellant argues that we should adopt this doctrine for the Navy and Marine Corps; the Government disagrees.

The Government states that the concept of vicarious entrapment has received little support from the Federal courts of appeal.[3] With certain exceptions, those courts have been reluctant to extend entrapment to third parties because it goes beyond the purpose of the doctrine, which is "to prohibit *the government* from *directly* involving an otherwise disinterested and disinclined person from committing a criminal offense." *United States v. Martinez,* 979 F.2d 1424, 1432 (10th Cir.1992) (citations omitted) (emphasis added), *cert. denied,* —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993). "When the government has no contact with the accused, that purpose has no relevance; therefore, without direct government communication with the defendant, there is no basis for the entrapment defense." *Id.* Stated otherwise, the Government argues that for a middleman to become the source of Government inducement, the Government must first induce the middleman into "helping net the distant defendant." *United States v. Hodges,* 936 F.2d 371, 372 (8th Cir.1991); *see also United States v. Bradley,* 820 F.2d 3 (1st Cir.1987) (holding against vicarious entrapment, but suggesting that the defense might be appropriate if there had been a showing that pressure had been put upon the third party at the instruction of the Government agent).

Vicarious entrapment has apparently received its greatest support from the Second Circuit. *See United States v. Valencia,* 677 F.2d 191 (2d Cir.1982) (where government inducement is indirectly relayed to third party, entrapment may be raised). However, in *United States v. Pilarinos,* 864 F.2d 253 (2d Cir.1988), the Second Circuit held that a vicarious entrapment defense would only be available where an unsuspecting middleman *directly* communicated the Government inducement. *Id.* at 256 (citing *United States v. Toner,* 728 F.2d 115 (2d Cir.1984)). The Court further clarified its position as to vicarious entrapment: when an unsuspecting middleman, on his own initiative, induces a third party to assist in the commission of the crime in response to pressure that has been placed upon him by a government agent, the issue of entrapment is not raised. *Pilarinos,* 864 F.2d at 256. Thus, it has been suggested that the Second Circuit has withdrawn somewhat from its original position. *See Hollingsworth,* 27 F.3d at 1204.

In *Hollingsworth,* the Seventh Circuit, although declining to endorse the doctrine of vicarious entrapment, stated:

> Perhaps the most accurate statement of the current law is that while there is no defense of either private entrapment or vicarious entrapment, there is the defense of derivative entrapment: when a private individual, himself entrapped, acts as agent or conduit for governmental efforts at entrapment, the government as principal is bound.

27 F.3d at 1204. This is, essentially, the position advocated by the appellant at oral argument.

*Hollingsworth* held that a third party could raise a derivative entrapment defense by finding that both defendants had been induced by the same government agent, although one of the defendants had not always dealt directly with that agent. *Id.* This result is nearly identical to that reached by the Second Circuit in *Pilarinos,* 864 F.2d at

---

3. "[T]he majority of Circuits ... have not recognized the defense of vicarious or derivative entrapment." *United States v. Martinez,* 979 F.2d 1424, 1432 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993) (citing *United States v. Marren,* 890 F.2d 924, 931 (7th Cir.1989); *United States v. North,* 746 F.2d 627, 630 (9th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985), *disapproved, United States v. Mkhsian,* 5 F.3d 1306 (9th Cir.1993); *United States v. Mers,* 701 F.2d 1321, 1340 (11th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983); *United States v. Beverly,* 723 F.2d 11, 12 (3d Cir. 1983); *United States v. Dove,* 629 F.2d 325, 329 (4th Cir.1980); *United States v. Burkley,* 591 F.2d 903, 911 n. 15 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979); *United States v. Garcia,* 546 F.2d 613, 615 (5th Cir.), *cert. denied,* 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977); *Holloway v. United States,* 432 F.2d 775, 776 (10th Cir.1970); *Whiting v. United States,* 321 F.2d 72, 76 (1st Cir.), *cert. denied,* 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963); *Beard v. United States,* 59 F.2d 940, 941 (8th Cir.1932)).

256. The Court in *Hollingsworth* also stated:

> The concern with recognizing a defense of vicarious entrapment is that it might enormously complicate the trial of criminal cases. We share that concern, and hence do not endorse the doctrine. *United States v. Marren,* 890 F.2d 924, 931 n. 2 (7th Cir.1989). In any case in which a government undercover agent or informant had been used, defendants with whom he had not dealt face to face or even over the phone could argue with more or less plausibility that the real criminals with whom they had dealt had merely been transmitting the inducements furnished by the agent or informant.... We add that if the first person whom the government entraps expands, embroiders, or elaborates the scheme proposed to him by the government, the accomplices with whom he associates himself in the larger scheme cannot shelter under his entrapment defense; nor, we believe, could he; nor could they if, independently of an embroidery by the first "entrapee," they had been predisposed to join in the scheme, as in *Carbajal–Portillo v. United States,* 396 F.2d 944, 947 (9th Cir.1968).

27 F.3d at 1204–05.

As indicated at the beginning of this opinion, we do not decide today whether vicarious entrapment exists under military law. We evaluate the appellant's case under the traditional law of entrapment discussed below.

## V. Entrapment Defense

The entrapment defense exists if "the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." Rule for Courts–Martial [R.C.M.] 916(g).

> The "Government" includes agents of the Government and persons cooperating with them (for example, informants). The fact that persons acting for the Government merely afford opportunities or facilities for the commission of the offense does not constitute entrapment. Entrapment occurs only when the criminal conduct is the product of the creative activity of law enforcement officials.

R.C.M. 916(g), Discussion. Once this defense is "placed in issue by some evidence, the prosecution shall have the burden of proving beyond a reasonable doubt that the defense did not exist." R.C.M. 916(a).

Thus, entrapment has two elements: (1) Government inducement, and (2) an accused with no predisposition to commit the offense. More specifically, if the Government has induced an individual to break the law and the defense of entrapment is at issue, to prevail on the issue, the Government must prove beyond reasonable doubt that the accused was disposed to commit the criminal act *prior to first being approached* by Government agents. *See United States v. Howell,* 36 M.J. 354, 358 (C.M.A.1993); *United States v. Daniels,* 39 M.J. 789, 791–92 (N.M.C.M.R.1993). The defense of entrapment exists to prevent Government officials from becoming overly aggressive and "implant[ing] in an innocent person's mind the disposition to commit a criminal act, and then induc[ing the] commission of the crime so that the Government may prosecute." *Jacobson v. United States,* 503 U.S. 540, 554, 112 S.Ct. 1535, 1543, 118 L.Ed.2d 174 (1992) (citing *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 213, 77 L.Ed. 413 (1932)). "The office of the entrapment defense is to draw the line 'between the trap for the unwary innocent and the trap for the unwary criminal.'" *United States v. Bell,* 38 M.J. 358, 360 (C.M.A.1993) (citing *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820–21, 2 L.Ed.2d 848 (1958)). As mentioned earlier, "[m]ilitary entrapment law mirrors the federal counterpart." *Bell,* 38 M.J. at 360 (citations omitted).

"Predisposition" refers to an accused's "inclination, willingness, or readiness to engage in the illegal activity for which he is charged.... [T]he focus [in determining] predisposition centers on the defendant's state of mind before government agents suggest[ed] illegal activity." *United States v. Dozal–Bencomo,* 952 F.2d 1246, 1250–51 (10th Cir.1991) (citation omitted). Predisposition should be judged by the "totality of the

circumstances." 3 GENE P. SCHULTZ, PROV-ING CRIMINAL DEFENSES § 13.04[5] at 13–41 (1993); *see also United States v. Cooper*, 35 M.J. 417, 425 (C.M.A.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993). Factors to be considered include the accused's "character, background, and state of mind." *United States v. Dion*, 762 F.2d 674 (8th Cir.), *rev'd on other grounds*, 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986). Predisposition may be shown circumstantially, albeit "[h]ow a person behaves on a particular occasion is some evidence of predisposition." *Id.*

"[A] profit motive does not automatically negate an entrapment defense." *United States v. Eckhoff*, 27 M.J. 142, 144 (C.M.A. 1988) (citation omitted). "At best, a profit motive is but one element in determining whether an accused was predisposed to commit the offense, and therefore, it cannot act as a *per se* bar to the defense of entrapment." *Id.* (citations omitted).

"The entrapment doctrine does not require law enforcement agents to have evidence of a defendant's criminal activity before approaching the defendant." *Bell*, 38 M.J. at 360 (citations omitted). "Evidence that 'a person accepts a criminal offer without being offered extraordinary inducements ... demonstrates his predisposition to commit the type of crime involved.'" *Id.* (citations omitted); *see also United States v. Evans*, 924 F.2d 714, 718 (7th Cir.1991) (cited in *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992)).

▆▆▆ Absent a clear showing to the contrary, an appellate court presumes that a judge understands and follows applicable law. *United States v. Montgomery*, 20 C.M.A. 35, 42 C.M.R. 227, 231, 1970 WL 7053 (1970). In this case, the record indicates that the military judge's attention was invited to the law relating to predisposition by the civilian defense counsel's concurrence with the comment that the case presented a "classic test for predisposition." Record at 228. Thus, even though the military judge made no special findings disclosing his thought process, we will presume that he knew and applied the law summarized above in this section of this opinion.

▆▆▆ Applying the law stated above to the evidence in the appellant's case, we readily find, beyond a reasonable doubt, that the appellant was not entrapped because he was predisposed to commit larceny when Luke asked for his assistance in stealing the NFTI. Several factors and reasons lead us to this conclusion.

First, the appellant was **easily persuaded** by Luke to join Luke's plan. Although the appellant testified that he was at first reluctant to join the plan, he also admitted that he never expressed any reservations about helping Luke. **He never said "no."** He never mentioned one reason why he and Luke should not steal from the Navy. Indeed, if we envision a spectrum of the degrees of persuasion, Luke's entreaty to the appellant surely appears at the opposite end of the spectrum from one that could be described as "constant badgering," "hounding," or "threatening."

Second, **right after agreeing to the plan, the appellant declined Luke's proffered opportunity to abandon the plan because it was dangerous.**

Third, the appellant was **primarily motivated by one thing: profit.** It was the end of the month, his money tank was about empty, and he needed to buy new dungarees to pass an inspection. Thus, as soon as Luke mentioned "$20.00," the appellant **immediately accepted Luke's offer without uttering one word indicative of hesitation.**

Fourth, the appellant's secondary motive was to develop a friendship with Luke. This means that he wanted to please Luke by cheerfully joining him in his off-duty activity, stealing and selling Navy equipment. Stated otherwise, **the appellant was inclined to do what Luke suggested, even if it involved commission of a serious crime.**

Fifth, **the relationship between the appellant and Luke was such that the appellant had no arguably good reason for believing that he must join Luke in criminal activity.** They were merely shipmates who had served on mess duty together for a relatively brief period of time; they were not old friends, relatives, or former partners in

crime. Thus, the appellant was not compelled to acquiesce in Luke's plans to either preserve a familial relationship or to avoid disclosure of other criminal activity.

Sixth, **the appellant's activity before and after the theft of the NFTI presents strong circumstantial evidence of his inclination to commit larceny at the time of Luke's offer.** For example, the appellant expressed no dissatisfaction with Luke when he learned that Luke was walking with him with a stolen gas detector that Luke intended to sell—which was from the appellant's ship—and willingly accompanied Luke to the location where Luke planned to sell the gas detector. Additionally, on 30 August 1991, the appellant wanted the money Luke had promised him and helped in the negotiations over the selling price of the NFTI.

At the bottom line, this case reminds us of Judge Cox's conclusion in *United States v. Cooper,* 33 M.J. 356 (C.M.A.1991): "Although initially appellant indicated his reluctance to get involved, he nevertheless jumped into the adventure with zeal and success." *Id.* at 359. Here, the appellant indicated no reluctance. He jumped into the sea of crime zealously and without a whimper. Thus, we hold that he was not entrapped. The second assignment of error is without merit.

### VI. Sentence Appropriateness

The distinction between a review of sentence appropriateness and consideration of clemency matters is significant: "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves. Clemency involves bestowing mercy—treating an accused with less rigor than he deserves." *United States v. Healy,* 26 M.J. 394, 395 (C.M.A.1988).

 This Court has been assigned by Congress only the task of determining sentence appropriateness. Congress has placed the responsibility for clemency in other hands (e.g., the convening authority's). *Id.* at 395–96.

"Generally, sentence appropriateness should be judged by 'individualized consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A. 1982) (citation omitted).

The appellant was convicted of stealing one item of expensive firefighting equipment from his ship and selling two items of his ship's valuable firefighting equipment. Those offenses can only be regarded as extremely serious. Considering all the circumstances of this case, we conclude that the sentence approved below is not inappropriate.

Accordingly, the findings and sentence approved below are affirmed.

Chief Judge LARSON and Senior Judge McLAUGHLIN concur.