UNITED STATES, Appellee

v

ROY E. SUTER, Private First Class, U. S. Marine Corps, Appellant

21 USCMA 510, 45 CMR 284

*Lieutenant David C. Sellergren,* JAGC, USNR, argued the cause for Appellant, Accused.

*Lieutenant James R. Lamb,* JAGC, USNR, argued the cause for Appellee, United States. With him on the brief was *Commander Michael F. Fasanaro, Jr.,* JAGC, USN.

## Opinion of the Court

DUNCAN, Judge:

We granted review in this case to determine whether the evidence is legally sufficient to support the appellant's conviction for the sale of LSD (specification 2 of the Charge). We affirm.

The evidence for the Government mainly consisted of the testimony of Corporal Hayes, Agent Webb, and a pretrial statement of the appellant. Hayes was working as an undercover agent ferreting out information concerning illegal drug traffic at Camp Lejeune. On the afternoon of June 23, 1970, Hayes and another informer, Webber,[1] were sent to a particular barracks for the purpose of trying to set up a controlled purchase of narcotics from one Griffith. While Hayes was unsuccessfully attempting to make a purchase from Griffith, Webber awakened Private First Class Heath. Heath was asked if he had any drugs or if he knew where they could get some. He replied in the negative, but offered to take Hayes and Webber to meet someone who might be able to help them. They proceeded to Messhall 226. Hayes testified regarding what occurred after their arrival:

"A. We walked in the front door and HEATH pointed to someone and told us there was our man, and walked off.[2] We walked over to SUTER.

"Q. What happened when you got over to SUTER?

"A. We asked him if he had anything, and he said no, he didn't have anything at the time; either he or a friend of his was going into town that night to get some.

"Q. What did you indicate—or what was your response to this statement by SUTER?

"A. We asked if we could—if he would pick us up 15 tabs; and he said yes, he would.

"Q. Fifteen tabs of what?

"A. He called it psilocybin.

"Q. What did you ask him?

"A. At that time, we asked him what it was, because neither one of us had ever heard of it. He said that he had taken it before, and he said that he'd stayed high for two or three days.

"Q. Would you please indicate to the military judge what the events were that occur[r]ed next.

"A. We asked him if the price—about the price of it. He said it was seven cents, which means seven dollars a tab. And he said that he would pick us up 15 tabs, and then

---

[1] At the time of trial, Webber had been separated from the Marine Corps with an undesirable discharge and did not testify.

[2] When Heath appeared as a defense witness he testified that he introduced Hayes and Webber to the appellant. At the direction of the military judge and with the concurrence of defense counsel, trial counsel further developed the matter of the introduction. At this point, Heath testified, "Well, I brought them in and said 'These guys want some drugs, see if you can help them.'"

we agreed to meet back there at five-thirty the next morning and pick it up."

Hayes testified that at no time did the appellant ask who they were, nor did he state that he could not or would not get drugs for them. Prior to June 23, neither Hayes nor Webber had spoken with Suter, and they had no knowledge that Suter either had drugs or would sell drugs.

Armed with identifiable bills and a radio signaling device supplied by agents of the Naval Intelligence Service, Hayes and Webber went to the messhall the next morning. Hayes further stated:

"Q. What happened when you got there?

"A. We asked him if he had the stuff and he said, 'yes'; and we told him at that time that we only wanted one; that no one had ever heard of it and we wanted to try it out. We asked him again what it was; he told us it was psilocybin, it was just a little bit weaker than LSD 25.

"Q. What happened next, pertaining to?

"A. WEBBER gave SUTER the seven dollars; SUTER took out the bottle—out the container, from his pocket. It was a clear container with a white plastic top. He took one tab out and gave it to WEBBER; and then took the seven dollars."

Thereafter, Hayes and Webber signaled Agent Webb and his partner, Agent Markland. When the agents entered the messhall, the appellant was pointed out and arrested.

Agent Webb testified that on the afternoon of June 23, he learned from informants Hayes and Webber that they had arranged to buy narcotics. He corroborated Hayes' testimony with regard to the arrangements made for the purchase and the arrest of the appellant. After warning Suter as to his right to silence and his right to counsel, Webb obtained an oral statement from the appellant in which the latter admitted that:

"512"

". . . he had been approached by the two informants and he had offered to sell them narcotics, or in this case, LSD, or a drug he referred to as slightly weaker than LSD. He stated that he had got them in Jacksonville from the Playground Bar from a man named SMITTY. He then went on to give me quite a bit of police intelligence information concerning narcotics usage and sources of supply in the Jacksonville area."

Prosecution Exhibit 2, the written pretrial statement of the appellant, contains the following information:

"Yesterday I was approached by two unknown Marines who were with a friend of mine named HEATH. They said that they heard that I could buy acid. I told them that I could help them but it would be a drug like LSD except it had a different name. I told them something like SLICILICON. They asked how much and I told them seven cents meaning seven dollars. They said that they would be back in about twenty minutes with the money. They came back about two hours later and told me that they wanted 15 caps of the stuff. I told them I would be at the mess hall in Bldg 226 the next morning at 0600 and they could pick it up then. I went to the PLAYGROUND, an after hours club near route 17 north, where I knew a man named Smitty was selling drugs. . . . I . . . bought 27 tabs of this new narcotic from him, paying $1.00 a tab. . . . This morning at approximately 0600 the two Marines that I met yesterday came into the mess hall and I sold them one tab. They said that was all the money that they could raise. I took seven dollars from them and gave them one tab from the vial."

The appellant testified in his own defense. While acknowledging the transaction with Hayes and Webber, he claimed that he initially declined to have anything to do with them. He repeatedly told them, " 'I don't sell narcotics'." When asked if he could

get some for them, he replied, " 'No, I don't have any on me and I'm not interested in selling narcotics'. " They persisted, and at that time other Marines began coming to the desk where Suter worked in order to sign for their meals and pay for them. Suter testified:

". . . I couldn't afford anybody overhearing this conversation, and directing suspicion towards me, and so to get rid of them I told them that I would try, I wasn't sure, but, and I wouldn't promise anything and they asked me if I could get it, when they'd be able to pick it up and I told them if I could get it, sometime the next day, that I wasn't making any promises because I didn't want to commit myself, and they said, 'Well, would six o'clock be okay?' and I told them, well, I told them if they wanted to come back then it would be all right but I wasn't sure . . . like I said, I wasn't going to promise anything."

That evening the appellant went to the Playground Club and purchased 27 tablets of Psilocybin from a friend from whom he had previously purchased narcotics for his own personal use. The next morning Hayes and Webber appeared and asked Suter if he had the stuff for them. Suter testified:

"Q. And what did you say?
"A. At first, I didn't say anything, I gave them a funny look, and they asked me, well, you know, 'Did you get it?', and I said, 'Well, I got stuff for me, but I don't want to sell it'.

"Q. And what did they say?
"A. And they said, 'Look, we had arranged to buy it', and I said, 'I'm sorry, I don't want to sell it. I told you yesterday I don't believe in selling narcotics'.

"Q. And what did they say?
"A. They said, 'Well, at least sell us one'.

"Q. What did you say to that?
"A. My exact words, I can't say . . .

"Q. Pardon?
"A. I can't see [sic] my exact words, I don't recall. I told them I don't believe in selling narcotics, and they were persistent for approximately five minutes, back and forth, asking me to sell it to them. Finally, they asked me again if I'd sell them one, and I saw the WO— excuse me, the OD, Officer of the Day, heading towards my comrats desk, so, and I sold them the one capsule to get rid of them.

"Q. How much did they pay you for it?
"A. Seven dollars, sir."

When questioned about Prosecution Exhibit 2, the appellant testified that it was incomplete because it did not contain his statement to the agent that he had initially declined to make the sale and that he attempted to have this put in the statement, but was told that it was not necessary since he had in fact made the sale. Suter acknowledged that he had purchased more drugs than Hayes and Webber had requested, as he wanted some for his personal use. He also stated that he had discussed drugs with Heath on one occasion but had never told him that he sold or would sell drugs. The appellant admitted using drugs starting at approximately 11-1/2 years of age and continuing during his service in the Marine Corps. He denied ever having sold drugs before.

On cross-examination the appellant admitted that he had quoted a price of $7.00 per tablet to Hayes and Webber, although he thought he could probably buy them from the wholesaler in lots of six or more for "anywhere from fifty cents to a dollar and a half" apiece. Seven dollars a pill is the "going price" at retail. When they "asked how much 15 would cost," Suter "took a piece of paper and I figured . . . I don't remember the exact cost, I think it was something like $105.00, sir." At one point, trial counsel inquired:

"Q. And at the time you approached SMITTY, you asked him for 27 of these pills with the intent

that part of these pills would be perspectively for your use and the rest were of indeterminate disposition?

"A. Yes. Like, I had definitely wanted twelve for myself and I wasn't sure what I was going to do with the 15 I bought that night. I knew that these Marines wanted them and I still was undecided on selling them."

At trial a plea of guilty was entered; however, during the providency inquiry, Suter maintained that he made the sale only upon the strong insistence of the law enforcement agents. As a result the guilty plea was rejected and the trial proceeded.

The appellant now contends that he acted solely as an agent for the purchasers and thus no sale was proved. Alternatively, he claims to have been entrapped.

This Court has held that one who acts in a given transaction solely as a procuring agent for a person is not a seller to that person. United States v Fruscella, 21 USCMA 26, 27, 44 CMR 80 (1971), and cases cited therein. In the case at bar, the appellant's trial testimony reflects that his transaction with Hayes and Webber does not come within the nonsale category. The purchasers were strangers to him. Heath did not even say that they were his friends. Suter financed the original purchase with his own money, established the price per pill, and made a substantial profit. He even figured, on paper, how much they would have to pay for fifteen pills at the "going price" for retail sales, notwithstanding the fact that, as he testified, purchases in lots of six or more generally called for a wholesale price. Under these circumstances, can it be said that he acted *solely* as the agent for the purchasers? We think not.

Was he entrapped into committing the offense by the Government informers?

Paragraph 216*e*, Manual for Courts-Martial, United States, 1969 (Revised edition), provides:

"Entrapment is a defense which exists when the criminal design originates with Government agents, or persons cooperating with them, and they implant in the mind of an innocent person the disposition to commit the alleged offense and thus induce its commission. . . . 'Innocent' in the context of entrapment means that the accused would not have perpetrated the crime with which he is presently charged but for the enticement of one of these persons."

See United States v Fenstermaker, 17 USCMA 578, 38 CMR 376 (1968); United States v Dorsey, 19 USCMA 458, 42 CMR 60 (1970); United States v Hawkins, 6 USCMA 135, 19 CMR 261 (1955). See also Sherman v United States, 356 US 369, 2 L Ed 2d 848, 78 S Ct 819 (1958).

Paragraph 216*e*, Manual, supra, is fashioned to make a part of military justice the principle that there are to be limits upon the conduct of law enforcement officials and those who cooperate with them in the struggle against crime. The doctrine of entrapment is now a prominent line of defense in American criminal jurisprudence, even though the debate continues as to whether the defense is a product of statutory interpretation, constitutional guarantee, public policy, or some other.[3]

Chief Justice Warren, in Sherman v United States, supra, stated at page 372:

"However, the fact that government agents 'merely afford opportunities or facilities for the commis-

---

[3] See Mr. Justice Roberts' concurring opinion in Sorrells v United States, 287 US 435, 453, 77 L Ed 413, 53 S Ct 210, 217 (1932); Mr. Justice Frankfurter's concurring in the result opinion in

Sherman v United States, supra; Banks v United States, 249 F2d 672 (CA 9th Cir) (1957); American Law Institute's Model Penal Code, section 2.13 (Proposed Official Draft, 1962).

sion of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law enforcement officials. . . . To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."

He further states at page 373:

". . . On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence."

When a claim of illegal entrapment was before us in United States v McGlenn, 8 USCMA 286, 291–292, 24 CMR 96 (1957), we said:

". . . All we hold is that when a showing of inducement by a Government agent is made, the prosecution must prove that its agents acted under a reasonable belief that the law was being violated by the accused. The gist of the defense of illegal entrapment is that an agent conceives an offense against the law and then incites a person to commit that offense for the purpose of prosecution. In United States v Certain Quantities of Intoxicating Liquors, 290 Fed 824 (D NH) (1923), the court, after carefully examining authorities, set forth the rule that in order to defeat a claim of an illegal entrapment, one of the following conditions must be met:

'. . . (1) reasonable suspicion on the part of the officers that the party is engaged in the commission of a crime or is about to do so; or (2) the original suggestion or initiative must have come from the perpetrator.'

"We adopt this rule."

We have deemed it necessary to set forth the posture of the law of entrapment in order to clarify the position we take regarding the facts of the instant case.

The appellant, urging that we find entrapment as a matter of law, argues that the evidence is clear that Hayes and Webber were looking for someone, anyone, from whom they could buy drugs. They had been directed to do so by agents of the Naval Investigation Service. Their purpose was to arrange a purchase in such a manner as to lead to the arrest of the seller. The selection of Heath brought them to the appellant. Heath had no drugs and did not know of any place where they might get them, but told Hayes and Webber, "I know of maybe somebody who could." At this point the informers did not even know the appellant's name much less have reason to believe that he would sell drugs to them.

The evidence is in conflict with regard to the appellant's initial reluctance to make the sale. Despite the fact the informers and Suter were unknown to each other there was no preliminary conversation.[4] It is clear that fifteen pills were to be purchased at $7.00 per pill, and that the transfer of pills and money would take place at the messhall the next morning.

Appellant argues that since the record shows that the original suggestion or invitation did not come from him and that because of the failure of the Government to prove that prior to the transaction he was reasonably suspected of criminal activity or otherwise predisposed to the commission of this type of offense, the defense of entrapment lies. We believe this argument misses the thrust of the law of entrapment.

The Government's evidence in the instant case is that only a single invitation was required to cause the appellant to engage in illegal activity. If

---

[4] The appellant testified that "[t]hey might have said 'Hi' or something like that, but, in the conversation, the first thing they had said, like, you know, that conversation concerning drugs, was, 'Can you get anything, LSD–25?'"

the Government witness' testimony is believed there were no words of persuasion, trickery, or fraud used in the transaction which in any fashion caused the appellant's thinking to alter to such an extent to say that the *criminal purpose* was the creation of the informers rather than his. Giving the Government's evidence its best reasonable view, we believe there is no illegal "inducement" which put to the Government a duty to produce evidence of a prior existing criminal disposition, without which proof the entrapment defense must be sustained as a matter of law. A mere invitation to crime is not a creative inducement. In United States v McGlenn, supra, at page 289, the Government informer "offered the accused $5.00 for the purpose of purchasing some marihuana cigarettes for him." The informer "continued to importune the accused, until the latter relented and consented to make the purchase." The accused testified he made the purchase only after the informer's "incessant persistence." Such facts amounting to inducement were not in dispute. Therefore, inducement having been shown, the Court stated:

". . . All we hold is that when a showing of inducement by a Government agent is made, the prosecution must prove that its agents acted under a reasonable belief that the law was being violated by the accused." [*Id.*, at page 291.]

Differing from that case, the facts of the instant case provide the fact finders with the permissible option of not finding a "showing of inducement." Thereafter, absent inducement, if none is factually found, the prosecution is not required to lift the burden of proof of reasonable belief that the accused was not heeding the law.

Viewing the Government's evidence most favorably, we are not able to discover the shocking display of conduct on the part of law enforcement officials which the law of entrapment was designed to purge in the bare request by agents to purchase narcotics. We are convinced that the military judge was not required to find as a matter of law that the appellant was unlawfully induced to commit an offense.

The decision of the Court of Military Review affirming the appellant's conviction of specification 2 of the Charge is affirmed.

Chief Judge DARDEN and Judge QUINN concur.