UNITED STATES, Appellee,

v.

Sidney P. COOPER, Sergeant First Class, U.S. Army, Appellant.

No. 65,924.

CM 8902034.

U.S. Court of Military Appeals.

Reargued April 7, 1992.

Decided Sept. 30, 1992.

For Appellant: *Major James M. Heaton* (reargued); *Lieutenant Colonel James H. Weise.*

For Appellee: *Captain Samuel J. Smith, Jr.* (reargued); *Lieutenant Colonel Daniel J. Dell'Orto* and *Major Kenneth T. Grant.*

*Opinion*

CRAWFORD, Judge:

This case is before us to reconsider our opinion in *United States v. Cooper*, 33 MJ

356 (CMA 1991). This Court granted reconsideration to determine whether the known targeting of an individual in a drug rehabilitation program requires dismissal of the charges and whether appellant was entrapped within the meaning of *Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992).

We hold that the known targeting of an individual in a drug rehabilitation program does not require dismissal of the charges and that appellant was not entrapped within the meaning of *Jacobson*.

I

Appellant voluntarily entered a drug treatment center operated by the Navy in Miramar, California, on September 6, 1988, for 6 weeks of intensive in-house drug rehabilitation and treatment. Upon completion of the 6-week program, he continued receiving treatment on an out-patient basis at Fort Myer, Virginia. This out-patient treatment lasted for 6 more months and involved attending daily counseling sessions and nightly meetings of Narcotics Anonymous.

In the fall of 1988, agents of the Army Criminal Investigation Command (CID) suspected that there was a drug ring operating within its headquarters. At about that same time, Mr. Rodney Powell, who had been arrested by military authorities for allegedly stealing and pawning his girlfriend's television set to obtain cash to buy cocaine, approached the CID to offer his cooperation in the drug-ring investigation. Powell wanted to reenlist in the Army and sought to exchange his cooperation with the CID drug suppression team for CID support for his reenlistment. Thus, the proverbial marriage of convenience was consummated.

Powell gave the CID the names of five or six individuals whom he claimed had sold drugs within the CID headquarters facility. Appellant was one of these individuals. As part of his cooperation, Powell agreed to attempt to purchase drugs from these individuals in a CID sting operation. On November 30, 1988, Powell made a drug buy from one of the named individuals and on December 1 made a second drug buy from another.

On December 2, Powell made a telephone call to appellant from the CID drug suppression team office. Present in the office was Powell's CID handler, a 21-year-old specialist who had completed basic training in July 1987 and had worked on the drug suppression team since August 1988. Powell testified that he called appellant and asked if he could get some drugs. Appellant responded that he was "not using" drugs and was not "doing anything else." However, Powell testified that he called again.[1] The exact number of calls is disputed. Powell told appellant, "I had this white boy that had some money and wanted to sell some, and I didn't know where to get any from, and did he know?" Whereupon appellant agreed to help Powell.

Powell and appellant scheduled a rendezvous at 2:25 p.m. on December 2 at the 7-Eleven store on Columbia Pike in Falls Church, Virginia, near the building where appellant worked. Appellant met Powell and the CID handler at the appointed time and place. They proceeded together in the CID agent's car to an apartment in a multiple dwelling unit in Washington, D.C. During the ride to the dwelling, appellant admitted to selling drugs while stationed in Panama and explained to the CID handler how to turn powder into crack cocaine. The handler testified that it was during this car ride that he also learned for the first time that appellant was in a drug rehabilitation program. Powell testified that appellant "had been in rehabilitation treatment in California." The handler also testified that he was not familiar with Army Regulation (AR) 600-85 or 195-15.

Upon arriving at an apartment in Washington, D.C., Powell and the handler went with appellant to the dwelling where appellant had a conversation with some individu-

---

1. Powell only agreed to testify for the defense under a grant of immunity. He was angry at the CID agents when they would not continue to pay him to make other buys.

als in the apartment. Following that conversation, he took Powell and the handler to another apartment. There he was told by an unknown individual that there were no drugs there at that time but that there would be some there in a short period of time. Appellant, as well as Powell and the handler decided to take a break and went across the street to a Safeway store for a pack of cigarettes. After a short time, appellant returned to the second apartment and obtained cocaine while Powell and the handler waited in the car. When he returned to the car, appellant indicated that he had a "good deal" and would do it again if they needed more. Additionally, he suggested some locations for selling drugs.

On December 5, Powell telephoned appellant again and asked if appellant would make another drug purchase. Appellant replied in the affirmative, and they agreed to meet at the same 7–Eleven store. Upon meeting there, appellant suggested that, rather than taking the handler's car, they take his car as he could drive and get them there quicker. On the way to the crack house appellant indicated that he could make a third buy for the handler but this would have to be done before Wednesday as his wife was arriving on that day. When they reached the same location where the first purchase was made, two black males across the street from the apartment building approached appellant. Appellant appeared to recognize them because he waved at them. They turned out to be appellant's suppliers. Although appellant expressed some concern that the two men might be armed with automatic weapons under their trenchcoats, he showed no hesitancy in getting out of the car and talking to them. He then returned to the car, took $500 from the handler, and accompanied the two men into the apartment house. After about 10 minutes, appellant returned with drugs. Once again he indicated that it was a good deal and this time asked that he be compensated for his services.

## II

As indicated by Judge Cox in his original opinion herein, this case "is a sad commentary on the lure and addictive nature of cocaine." 33 MJ at 357 n.3. We also agree with the views expressed by Senior Judge Everett in *Cooper* as follows:

In the view of many, illegal drugs is the single most serious law-enforcement problem facing governments at all levels today. Drug abuse is a killer: It kills bodies; it kills spirit; it kills imagination; it kills love. It is not hyperbolic to call the drug epidemic in this country a human and social tragedy. Appellant's personal downfall, summarized in footnote 3 of the lead opinion, is all too common.

Law-enforcement efforts, however, are not enough, alone, to remedy this sickness. We cannot—and we do not—give up on the lives and souls of those whose addictions own them; we can—and we do—put huge efforts into helping the helpless regain control of their own destinies. This not only is the morally right thing to do, but also it is socially beneficial.

Rehabilitation of a drug addict is extremely difficult. The physical and psychological torment that the addict experiences is a personal hell that, I am confident, cannot be fully appreciated by anyone who has not suffered the experience. It is, as well, a fragile process—one that is not without inherent steps backward and one that easily can be frustrated by outside influences.

*Id.* at 361. But this is not a case in which an alcoholic is given alcohol to drink or a cocaine user is given cocaine to use. Instead, this is an instance in which an individual who had sold cocaine in the past was willing to become a distributor for profit, a merchant in the spread of human misery that is this country's drug epidemic.

## III

In our prior opinion Judge Cox did not find a knowing targeting of an individual in a drug rehabilitation program. Chief Judge Sullivan, concurring in the result, indicated the case need not be resolved on

the agent's lack of knowledge because the regulations prohibit gathering information from individuals in a drug rehabilitation program and not a "sting" operation.

Senior Judge Everett recognized the evils of drug abuse, the importance of rehabilitation, and the difficulty of rehabilitating individuals who had been involved in drugs. He believed that the regulations required that participants in the drug rehabilitation program

> be left alone, free from any government contacts that might well frustrate the successful rehabilitation of the patient. Any action that might psychologically lure a flawed and vulnerable addict back into the environment he is trying so mightily to shun is morally reprehensible and legally proscribed.

*Id.* at 362.

## IV

Both the federal criminal law system and the military criminal law system have varied sources of rights. The hierarchical sources of rights in the military include the Constitution; Federal statutes, *e.g.*, the Uniform Code of Military Justice; the Executive Orders containing the Military Rules of Evidence and the Rules for Courts–Martial; Department of Defense directives; service directives; and federal common law. The varied sources in the Federal system include the Constitution, Federal statutes, Federal Rules of Criminal Procedure, Federal Rules of Evidence, and common law. These sources are set forth in terms of paramountcy. Even so, service

directives may set forth greater rights than required by the Constitution, the Code, or the Manual for Courts–Martial, United States, 1984.

In determining whether the charges should be dismissed for a violation of service directives, examination must be made of the Supreme Court decisions concerning the nature of the directive and those discussing the dismissal remedy for prosecutorial misconduct under the Federal Rules of Criminal Procedure and constitutional violations by investigators.

## V

■ The regulations applicable to this case are an outgrowth of 21 USC § 1101 *et seq.*, first enacted in 1972. Congress was determined to have a national policy which focused the resources of the Federal Government on drug abuse, hoping to reduce significantly the incidence of drug abuse, as well as the social and personal cost to the country. Congress also sought to ensure that a long-term strategy was developed by various departments of the Government to combat drug abuse.

The Army's program was an outgrowth of this strategy. To encourage individuals to take advantage of the Army drug abuse rehabilitation program, a series of rules were set up to encourage individuals on their own initiative to identify themselves and enter the programs for treatment and rehabilitation. However, AR 600–85 has a "limited-use policy" which provides for the free flow of information and prevents misuse of this information.[2] The program was

---

**2.** Paragraph 2–16a of Army Regulation (AR) 600–85, Personnel—General: Alcohol and Drug Abuse Prevention and Control Program (21 Oct. 88), states:

> It is Army policy to encourage voluntary entry into the ADAPCP. Military Police, Criminal Investigation Division [sic] (CID) special agents, and other investigative personnel will not solicit information from clients in the program, unless they volunteer to provide information and assistance.

Also, paragraph 2–16b of this same regulation recognizes:

> Title 42, Code of Federal Regulations, prohibits undercover agents from enrolling in or

otherwise infiltrating an alcohol or other drug treatment or rehabilitation program for the purpose of law enforcement activities.

The parallel civilian regulation, § 2.17, 42 C.F.R. Ch. 1 (10–1–90 Edition) provides:

> § 2.17 Undercover agents and informants.
>
> (a) *Restrictions on placement.* Except as specifically authorized by a court order granted under § 2.67 of these regulations, no program may knowingly employ, or enroll as a patient, any undercover agent or informant.
>
> (b) *Restriction on use of information.* No information obtained by an undercover agent or informant, whether or not that undercover agent or informant is placed in a program

not intended to protect a soldier attempting to avoid disciplinary or adverse action. The limited-use policy did not grant immunity but provided that, if there was a self-referral or a command referral, information concerning illegal drug abuse or evidence of incidental possession for personal use obtained as part of medical care or rehabilitative treatment may not be used by law enforcement.[3] This limited use of the information applied whether there was command referral or referral by the individual himself or herself. Only drug use or possession incidental to normal use was protected.[4] It did not protect an individual in terms of an immunity or a limited-use policy as to information regarding sales or distribution, and we agree with the rationale of Chief Judge Sullivan as expressed below that it would not protect appellant in this case:

> Paragraph 3–7, Army Regulation 195–2 (30 Oct.1985) ... prohibited ... the gathering of information, not the conducting of a "sting" operation....
>
> The regulations do proscribe placement of informants in these programs, and use

*pursuant to an authorizing court order, may be used to criminally investigate or prosecute any patient.*
[52 FR 21809, June 9, 1987; 52 FR 42061, Nov. 2, 1987] (Emphasis added.)

3. Paragraph 3–7, AR 195–2, Criminal Investigation: Criminal Investigation Activities (30 Oct 85), charges:

> In compliance with the Army's ADAPCP policy, CID will investigate participants in ADAPCP for controlled substance offenses only if the offense occurred after entry into the program or if the participant has been identified as a suspect or subject prior to the time of entry into the program. Participants in ADAPCP will not be knowingly approached by CID special agents for the purpose of soliciting information about controlled substances distribution unless the participant voluntarily offers to provide such information.

Even more pointedly, paragraph 2–5b(5), CID Regulation 195–15, Criminal Investigation: USACIDC Source Program (1 Nov.1987), asserts:

> The Alcohol and Drug Abuse Prevention and Control Program (ADAPCP) prohibitions and restrictions are defined in AR 600–85. USACIDC special agents and other investigative personnel, to include sources, will not solicit information from participants in ADAPCP. Information which is volunteered

of information gathered by informants or undercover agents against the patients of such a program. However, these regulations cannot be reasonably construed to give patients immunity for post-entry drug offenses observed and participated in by government agents or informants.

33 MJ at 359–60.

However, even if we were to read these regulations to protect appellant from buying drugs, under a series of Supreme Court cases, appellant would not be entitled to dismissal of the charges.

## VI

■ In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988), the Court indicated in an 8–1 opinion that it was inappropriate for the Federal courts to dismiss indictments in the absence of prejudice. The trial court in *Bank of Nova Scotia* found a number of violations of Fed.R.Crim.P. 6 governing grand-jury proceedings. Even so, the Supreme Court con-

is acceptable, as long as it is not obtained within an ADAPCP facility or in such a manner as to jeopardize the safety of the source or in a way which compromises the credibility of the ADAPCP.

4. *Cf.* Alvarey, *The Scope of the Alcohol and Drug Abuse Prevention and Control Program's Exemption Policy,* The Army Lawyer 12, 13 (Dept. of the Army Pamphlet 27–50–92, August 1980)(footnote omitted).

Under the predecessor to AR 600–85 at issue in this case, Major Alvarey stated in his article:

> Transactional immunity is applicable only if the offense is one of alcohol abuse, drug use, or drug possession incidental to personal use.... Sniffing cocaine and smoking marijuana would likewise fall within the transactional immunity provisions since one who is dependent on drugs would be likely to commit these offenses. On the contrary, transactional immunity would not attach to robbery since it is not an offense which is directly related to alcohol abuse, drug use, or drug possession incidental to personal use, even if it is committed while the servicemember is under the influence of drugs or alcohol. Nor would transactional immunity attach for the sale or distribution of marijuana since these are not offenses of drug use or possession incidental to personal use.

sidered and rejected use of the dismissal remedy without examining for prejudice. To hold otherwise, the Court indicated, would be a violation of the commands of Fed. R. Crim. P. 52(a), which requires the Federal courts to disregard "[a]ny error ... which does not affect [the] substantial rights" of the accused. "It follows that Rule 52 is, in every pertinent respect, as binding as any statute duly enacted by Congress...." *Id.* at 255, 108 S.Ct. at 2373. The Court also noted that there was no "history of prosecutorial misconduct" spanning a number of years so "as to raise a substantial" or "serious question" of a systemic problem. *Id.* at 259, 108 S.Ct. at 2376. Applying the prejudice test, the Court indicated that the critical issues are: what effect the error had or reasonably may be taken to have had on the grand jury's decision; whether it has been "established that the violation substantially influenced the grand jury's decision to indict"; or whether there exists "grave doubt" that the indictment "was free from the substantial influence of [the] violations." *Id.* at 256, 108 S.Ct. at 2374. The Court noted that Fed.R.Crim.P. 52 had a statutory base and had the same "force and effect" as a statute. *Id.* at 255, 108 S.Ct. at 2373. Thus, a Federal court has no "discretion to disregard the Rule's mandate" because to do so would "disregard constitutional or statutory provisions." *Id.* at 255, 108 S.Ct. at 2374. Justice Kennedy went on to state: "The balance struck by the Rule between societal costs and the rights of the accused may not casually be overlooked 'because a court has elected to analyze the question under the supervisory power.'" *Id.* at 255, 108 S.Ct. at 2374, quoting *United States v. Payner*, 447 U.S. 727, 736, 100 S.Ct. 2439, 2447, 65 L.Ed.2d 468 (1980). The majority noted that this case should be distinguished from "a class of cases in which indictments are dismissed" because "the prejudicial impact" is so great there are deemed to be fundamental errors. An example would be the discriminatory selection of a grand jury. 487 U.S. at 256–57, 108 S.Ct. at 2374–75. Even so, the courts must look to

see whether alternative remedies are available. *Id.* at 257, 108 S.Ct. at 2374.

Likewise, in *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), the Court held dismissal is not an appropriate remedy for misconduct in the indictment process when the error had been rendered harmless. The Court in *Mechanik* assumed that there had been a violation of Fed.R.Crim.P. 6(d) by the presence of other than specified persons, but indicated that the error was harmless based upon the factfinder's subsequent guilty verdict. Thus, an error cannot be considered other than harmless where it would not have influenced the decision of the factfinder.

Even when there have been allegations of flagrant and persistent prosecutorial misconduct, as in *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), the Court held that a court should not mandate automatic reversal without regard to the prejudicial impact of the misconduct, even where the conduct was occurring "with disturbing frequency ... throughout th[e] circuit." *Id.* at 504, 103 S.Ct. at 1978. The Court insisted upon the harmless-error test being applied.

The harmless-error analysis should be applied in lieu of post-conviction dismissals. The Court in *Hasting* indicated within certain parameters that Federal courts may exercise their "supervisory powers ... within limits [to] formulate procedural rules not specifically required by the Constitution or the Congress." *Id.* at 505, 103 S.Ct. at 1978. The implication is that the harmless-error rule should be applied unless there is no reasonable alternative to dismissal. *Id.* at 506 n.5, 103 S.Ct. at 1979 n. 5. The same rule would be binding on the Court of Military Appeals as to application of Article 59(a), Uniform Code of Military Justice, 10 USC § 859(a).

The Supreme Court also has not permitted employment of the exclusionary rule for violation of Internal Revenue Service regulations prohibiting consensual electronic surveillance between taxpayers and IRS agents absent prior authorization. *United*

*States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). In *Caceres* the Court in a 7–2 opinion noted that neither the Constitution nor a Federal statute requires an official to approve consensual electronic surveillance. The duty to enforce an agency regulation is most evident when compliance is mandated by either the Constitution or a statute to ensure a basic right. *Bridges v. Wixon,* 326 U.S. 135, 152–53, 65 S.Ct. 1443, 1451–52, 89 L.Ed. 2103 (1945). However, an error in interpreting the regulation does not give rise to a Constitutional question. "Nor is ... the Due Process Clause ... implicated because an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." 440 U.S. at 752–53, 99 S.Ct. at 1471–72. To adopt

> a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures. Here, the Executive itself has provided for internal sanctions in cases of knowing violations of the electronic-surveillance regulations. To go beyond that, and require exclusion in every case, would take away from the Executive Department the primary responsibility for fashioning the appropriate remedy for the violation of its regulations.

*Id.* at 755–56, 99 S.Ct. at 1473–74 (footnotes omitted). The Court indicated that such a result might lead to "fewer and less protective regulations." *Id.* at 756, 99 S.Ct. at 1474. It would certainly seem more desirable to enforce these rules through the regulatory process, rather than having no rules to protect those who are in drug rehabilitation programs. As the Court stated in *Caceres:*

> In the long run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by stat-

ute, or to have them framed in a mere precatory form.

*Id.* at 756, 99 S.Ct. at 1474. The Court indicated that suppression of evidence should not be granted in the exercise of supervisory power. *Id.* at 757, 99 S.Ct. at 1474. Otherwise, it "would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing.... [T]he supervisory power does not extend so far." *United States v. Payner,* 447 U.S. at 737, 100 S.Ct. at 2447.

Recently the Court stated in *United States v. Alvarez–Machain,* —— U.S. ——, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992):

> Respondent and his *amici* may be correct that respondent's abduction was "shocking," .... [but] the decision of whether respondent should be returned to Mexico, as a matter outside of the Treaty, is a matter for the Executive Branch.

*Id.* at ——. 112 S.Ct. at 2196 (footnote omitted).

The Court in *Payner* and *Hasting* showed displeasure with the Federal courts exercising their supervisory power while disregarding the rules of criminal procedure or the constitutional decisions of the Court. It also indicated in *Hasting* that "reversals of convictions under the Court's supervisory power must be 'approached with some caution.' " 461 U.S. at 506–07, 103 S.Ct. at 1979. The Court expressed dissatisfaction that the Court of Appeals in dismissing the charges in *Hasting* did not consider a trauma to the victim of a particular heinous crime or the practical problems of retrying the case 4 years after the event.

These decisions are binding on the Federal Courts of Appeals and the Court of Military Appeals, all subject to the direct review of the Supreme Court.

## VII

■ This does not mean that we necessarily condone the law enforcement conduct that took place in this case. One cannot help but feel sympathy for a defen-

dant caught up in these circumstances. However, this does not give rise to use of this Court's supervisory authority to dismiss the charges, particularly when those in charge of enforcing the regulations could take action on their own, but have not chosen to do so.

Even though Powell, a non-government informant, admitted knowing that appellant had been in a drug rehabilitation program in California, this knowledge should not be imputed to the Government. A parallel situation occurs when deliberately false or reckless statements made by non-government informants are not imputed to police officers. *See United States v. Henry,* 933 F.2d 553 (7th Cir.1991). The Supreme Court indicated it would leave this imputation question for another day. In *Franks v. Delaware,* 438 U.S. 154, 170, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978), the Court stated:

> [B]ecause we are faced today with only the question of the integrity of the affiant's representations as to his own activities, we need not decide, and we in no way predetermine, the difficult question whether a reviewing court must ever require the revelation of the identity of an informant. . . .

This is not an instance of an individual expressly recruited and hired to work on a case. Powell was seeking help because of his own arrest, had agreed to work with law enforcement officials, and was compensated for his tips.

The handler testified that he did not know that appellant was in a drug rehabilitation program until the trip to Washington, D.C., to make the first purchase. He further testified that he was not aware of the Army regulations governing use of information garnered from individuals in the drug rehabilitation program. While his ignorance of applicable regulations is regrettable, it should not give rise to dismissal of the charges.

If we were to take action such as dismissing the charges, it could have a chilling effect on the formulation of additional standards by the Executive Department.

There are a variety of tools available to the Executive Branch to determine whether a violation of its regulations has occurred and, if so, what action should be taken against those violating the regulations, *e.g.,* prosecution under Article 92, UCMJ, 10 USC § 892, administrative actions against the responsible individuals, and notations on fitness reports.

Appellant should have no right to a dismissal of the charges against him because the alleged violations of internal policy rules did not in any way affect the facts presented as to whether the crime was permitted. This is not an instance of a violation of a regulation resulting in introduction of unreliable evidence.

## VIII

■ In *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992), the Supreme Court held that the Government's sting operation amounted to entrapment when after more than 26 months of communicating with a target via mailed pamphlets, "pen-pal" letters, attitude surveys, and catalogs, they finally persuaded him to order a magazine containing child pornography. The majority recognized that the Government may use undercover agents and various stratagems to catch those engaged in criminal activities. Citing prior case law the majority said that "however, Government agents may not originate a criminal design, and plant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Id.* at ——, 112 S.Ct. at 1540. *See also United States v. Whittle,* 34 MJ 206 (CMA 1992).

RCM 916(g), Manual, *supra,* sets forth two elements for the entrapment defense: "It is a defense that the criminal design or suggestion to commit the offense originated in the Government and that the accused had no predisposition to commit the offense." The first element is referred to as the inducement element and the second, as the predisposition element. As in *Jacobson* and in this case, the inducement element is

not an issue as the Government does not dispute that appellant was induced to commit the crime. The sole issue is the predisposition element. In *Jacobson*, the Court indicated that, when "the defense of entrapment is at issue, ... the prosecution must prove beyond [a] reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." —— U.S. at ——, 112 S.Ct. at 1540. The predisposition element could be established by the following: reasonable suspicion that the defendant has been involved with the sale of cocaine in the past[5] or evidence that the person drawn to the opportunity was predisposed to engage in the contemplated illegal activity. How a person behaves on a particular occasion is some evidence of predisposition.

The latter may be shown circumstantially by introducing evidence of the following: accused merely afforded opportunity to commit the crime, *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958); a single invitation without any fraud or trickery, *United States v. Suter*, 21 USCMA 510, 515, 45 CMR 284, 289 (1972); informant not a friend of accused, *United States v. McGlenn*, 8 USCMA 286, 24 CMR 96 (1957); a profit motive, *United States v. Hebert*, 1 MJ 84 (CMA 1975); or a ready response to informant's initial suggestion, *United States v. Williams*, 3 MJ 555 (ACMR 1977), *rev'd on other grounds*, 4 MJ 336 (CMA 1978).

"The sole piece of preinvestigation evidence" in *Jacobson* was a "1984 order" to lawfully receive a magazine entitled "Bare Boys." —— U.S. at ——, 112 S.Ct. at 1541. Justice White concluded in *Jacobson:* "Evidence of predisposition to do what once was lawful is not, by itself, sufficient to

show predisposition to do what is now illegal." *Id.* at ——, 112 S.Ct. at 1542.

There was more than a "sole piece of ... evidence" in this case.[6] There was evidence that appellant had used and sold cocaine in the past. In fact, he bragged about the ability to make crack from powdered cocaine. Second, depending on whose testimony you accept, there was either a single invitation to distribute drugs or three invitations within a short period of time; and the invitation was accepted by appellant. Additionally, at least on one occasion, appellant indicated that he would like his profit and showed his willingness to buy other drugs for the government agent anytime before his wife's arrival.

Lastly, this case does not involve outrageous government conduct. *See, e.g., United States v. Winslow*, 962 F.2d 845, 849 (9th Cir.1992)(furnishing bomb components not outrageous conduct).

The decision of the United States Army Court of Military Review is affirmed.

COX, Judge (concurring):

I agree with Judge Crawford's opinion. I write only to underscore several points. First, service regulations are Executive Branch creations, and there are many of them. Most of these directives establish policies and procedures for the orderly governance of the service. A small percentage of service regulations, by their terms, are "punitive" regulations, in whole or in part. Failure to comply with punitive regulations can result in punishment under Article 92, Uniform Code of Military Justice, 10 USC § 892, which proscribes, inter alia, the violation of or failure to obey any lawful general order or regulation. This case has nothing to do with Article 92.

---

5. To prevent reliance on rumors as to past use or possession, reliability of the informant should be well-established. *United States v. Skrzek*, 47 CMR 314, 316–18 (ACMR 1973).

6. In contrast to the dissent's factual assertions, one could easily draw different interpretations. But we must recognize that the prior opinion as to the facts is not binding because we are not a

factfinding authority. A fair reading of the facts does not support the dissent. In any event, as to the entrapment issue, all reasonable inferences and credibility choices must be drawn in favor of the court members' verdict. *United States v. Leavitt*, 878 F.2d 1329, 1335 (11th Cir.1989). The same is true of the due process issue.

Rather, appellant was charged with distributing drugs under Article 112a, UCMJ, 10 USC § 912a. His claim, however, is that he is entitled to have his prosecution barred, or the evidence suppressed, by virtue of the Army's drug rehabilitation regulations. Admittedly, as amply described in the principal opinion, those regulations restrict law enforcement agents from approaching persons in the drug rehabilitation program and from soliciting information about drug activities. Appellant's complaint, however, is misdirected.

The Secretary of the Army, the proponent of these regulations, established the drug rehabilitation program. Presumably the language forbidding military law enforcement authorities from soliciting information was designed to create something of a sanctuary for those in the program, and to convince prospective enrollees of the integrity of the program. If law enforcement officers were to use those programs as target pools for investigative purposes, the word undoubtedly would quickly get out. The result would be that few drug users would apply, and the program would fail its purpose of saving soldiers.

That unfortunate consequence does not convert a bar to approaching into a bar to prosecution or an exclusionary rule. It is not the mission of this or any military court to make the Secretary's drug program more effective. If the Secretary believes that law enforcement personnel are mucking up his program, the Secretary can fix that, and he can certainly inhibit prosecutions in derogation of his regulations.

On the other hand, had appellant found himself in trouble *as a consequence of turning himself in* or for providing drug-related information as requested, no shortage of remedies would be available. Likewise, as Chief Judge Sullivan points out in *United States v. Cooper*, 33 MJ 356, 360 (CMA 1991)(concurring in the result), had the agents tried to entice appellant back to drug usage, the results would be far different. In addition, as I earlier indicated, had law enforcement authorities "sought out" appellant *because he was in the program*

"for the purpose of setting him up for a subsequent arrest," *id.* at 358, I would find a violation of due process.

However, such things did not occur here. Instead, appellant was approached by a friend-turned-informant. The record does not even indicate that the informant knew appellant was still in drug rehabilitation *at the time appellant was approached.* Further, the record makes it clear that the agent did not know appellant was in a program until the first transaction was *in progress.* Thus appellant clearly was not targeted as a result of being in the program.

In addition, there is no hint in this record that appellant was being tempted by authorities to use drugs himself. To the contrary, the appeal was not to appellant's addiction to drugs but to his willingness to traffic in the misery of others. I find nothing in the Fourth, Fifth, or Sixth Amendment that succors that.

SULLIVAN, Chief Judge (concurring in part and in the result):

I join the lead opinion today to the extent it tracks my earlier opinion in this case. *See United States v. Cooper*, 33 MJ 356, 359 (Sullivan, C.J., concurring in the result). I also join its analysis based on *Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992). However, I offer no comment on Parts VI and VII of this opinion which I consider unnecessary.

GIERKE and WISS, Judges (dissenting):

We have carefully considered the opinions filed originally in this appeal by the Chief Judge, Judge Cox, and Senior Judge Everett, 33 MJ 356 (1991), as well as the lead opinion and separate opinions on this reconsideration. After doing so, we find ourselves in agreement with the dissenting opinion of Senior Judge Everett, *id.* at 360, so we must dissent from the lead opinion here because it suffers from the same analytical flaws that were addressed in that opinion. In addition to embracing that opinion, however, we write to offer some

specific comments on the Court's treatment of this appeal on reconsideration.

## I

### A

The rather benign factual scenario leading to this prosecution that is set out in the lead opinion omits a number of important points that not only are not so benign but also are legally important.

First, when Powell gave the agents of the Army's Criminal Investigation Command (CID) appellant's name as one of the five people he was to turn in who were "dealing drugs," Powell had no basis at all on which to even suspect that appellant *ever* had distributed drugs, much less that he still was doing so. As Senior Judge Everett noted, "Appellant came to Powell's mind because the two of them had, in the past, used cocaine together. Powell candidly admitted at trial, however, that he had no knowledge at all that appellant ever had sold drugs." *Id.* at 362. He figuratively pulled appellant's name out of a hat.

Second, Agent Duperron, Powell's CID handler, did testify that he first had learned of appellant's participation in a drug-rehabilitation program during the car ride to Washington, D.C., as the lead opinion states. Senior Judge Everett pointed out, however, that Duperron acknowledged on cross-examination that he "could not 'recall' whether Powell had told him early on about appellant's rehabilitation participation" and conceded "that Powell 'could have' told him that." *Id.* at 362. Thus, Duperron's late-learning of appellant's rehabilitation effort is not clearly established in the record, as the lead opinion asserts.

Third, even before the initial telephone call that Powell made to tempt appellant, out of the blue, to distribute drugs, Powell knew that appellant was in drug rehabilitation. *That* was the *reason* that, as the lead opinion acknowledges, appellant told Powell "that he was 'not using' drugs and was not 'doing anything else.'" 35 MJ at 418. Undeterred, however, by having no

reason to suspect that appellant ever had distributed drugs and by knowing that appellant then was in a rehabilitation program, Powell doggedly pursued his plan to enlist appellant into distributing drugs to him.

### B

Judge Crawford here, as did Judge Cox in the original appeal, asserts that Powell's conceded knowledge from the beginning that appellant was in rehabilitation "should not be imputed to the Government." By way of rationale, the majority likens this to a "parallel situation" where a "non-government" informant's "deliberately false or reckless statements ... are not imputed to police" who then seek a search warrant. 35 MJ at 424.

One does not need to look, however, for a "parallel situation." As Senior Judge Everett pointed out in the original appeal, "[T]he Government cannot escape the taint associated with Powell's own knowledge of this participation. 'The Government cannot make such use of an informer and then claim disassociation through ignorance.' *Sherman v. United States*, 356 U.S. 369, 375 [78 S.Ct. 819, 822, 2 L.Ed.2d 848] (1958)." 33 MJ at 362–63. As to whether Powell was a "non-government informant," para. 1–2d, CID Reg. 195–15, expressly acknowledges, "Registered sources are always considered agents of the Government." Moreover, as we discussed earlier, the record is far from clearly establishing that Duperron, himself, did not have early knowledge of appellant's rehabilitation participation.

On the basis of *all* of the facts—including those omitted from the lead opinion but set out earlier in this opinion—we agree with Senior Judge Everett that the CID's efforts to lure appellant into drug trafficking—while knowing that appellant then was in rehabilitation and without having any notion that, while in rehabilitation, appellant was violating the drug laws—flew in the face of applicable regulations. We reject as too narrow the view of Chief

Judge Sullivan in his original opinion, adopted by the lead opinion here, that those regulations prohibit only "the gathering of information [from people in a rehabilitation program], not the conducting of a 'sting' operation." *See* 33 MJ at 359.

### C

At this point, it seems appropriate to address the matter of regulatory violations by law enforcement personnel as bases for judicial relief—a matter to which the majority devotes a good deal of attention.

The two interrelated issues originally granted review by this Court question whether the Government "overc[a]me appellant's entrapment defense" (*see* Part II, *infra*) and "whether due process prohibited the police from pressing appellant to obtain cocaine." *See* 33 MJ at 356, 357. We have searched appellant's pleadings in vain to find where he has argued that the charges should be dismissed or the evidence suppressed (*see* Judge Cox's concurring opinion) *simply* on the ground that the Government violated service directives. Our understanding of appellant's argument on this issue is that public policy considerations which have been codified by federal statutes and promulgated through Army regulations prohibit government attempts to lure recovering addicts in rehabilitation programs back into drug-related crime since such attempts waste resources and defeat rehabilitation efforts. Final Brief at 9.

Even the majority acknowledges that the regulations in question here "are an outgrowth of 21 USC § 1101 *et seq.*, first enacted in 1972," which manifested the determination of Congress "to have a national policy which focused the resources of the Federal Government on drug abuse, hoping to reduce significantly the incidence of drug abuse, as well as the social and personal cost to the country." More specifically, the majority recognizes that "Congress also sought to ensure that a long-term strategy was developed by various departments of the Government to combat drug abuse. The Army's program was an outgrowth of this strategy." 35 MJ at 420–421.

With light thus properly focused on the granted issue and the basis of the argument in support of it, violation of service directives that occurred here has been only a means by which appellant has offered to show the outrageousness of the Government's conduct in enticing him into distributing drugs. Appellant contends that creating a crime through such governmental conduct should be considered "outrageous" enough to warrant dismissal of the charges on due process grounds.

Merely addressing whether government agents technically violated their regulations and whether those violations, if any, should result in dismissal of the charges simply sidesteps this issue. This is not a case of police or prosecutorial misconduct that occurred after a crime was committed and the culprit apprehended for that crime. Neither is this a case that properly is subject to the "harmless error" analysis suggested by the majority. *See* Part ID, *infra*. Instead, this is a case in which regulations have been issued for public-policy reasons to protect recovering drug addicts who are in a drug-rehabilitation program.

Creating a crime for an otherwise innocent party in one of these programs to commit, as happened here, does more than merely defeat the purpose of the regulations; it also flies in the face of declared, long-standing public policy of Congress. Additionally, it is contrary to "[t]he function of law enforcement," which "is the prevention of crime and the apprehension of criminals." *Sherman v. United States*, *supra* at 372, 78 S.Ct. at 820. *See* Part II, *infra*.

Moreover, we seriously doubt that dismissal of appellant's charges on due process grounds based on reckless and legally proscribed behavior that creates a crime rather than enforces the law "could have a chilling effect on the formulation of additional standards by the Executive Department," as the lead opinion suggests. 35 MJ at 424. We believe it more likely that dismissal will result, if anything, in

more conscientious law enforcement in which innocent persons are left alone and in which public policy is honored by those whose responsibility it is to enforce it.

#### D

Finally, we are bemused by the lead opinion's discussion of lack of "prejudice" in this case, 35 MJ at 422–423, in the same context as it would discuss prejudice from admission of erroneously discovered evidence. Let us be clear: Except for the Government's outrageous conduct in violation of a myriad of regulations that were promulgated to implement national policy, appellant would not have been telephoned at all by Powell.

Instead, a person who, for all anyone knew then or knows today, might have succeeded in rehabilitation was dragged back into the black-hole of the drug community and prosecuted and jailed, all in the name of law enforcement. We call that prejudice.

#### II

Relatedly, as to the issue of entrapment, it seems to us as we mentioned earlier that the complete picture of the Government's active efforts here portrays a vision more like crime-creation than like law enforcement. Simply stated, there *was* no crime and there was no basis to believe there *could* be a crime—until the Government, in the form of its registered source Powell, *created* the crime.

The Supreme Court, in *Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992), held that, where the Government induces the criminal conduct—as the lead opinion acknowledges occurred here (35 MJ at 424–25)—"the prosecution must prove *beyond reasonable doubt* that the defendant was *disposed to commit the criminal act prior to first being approached* by Government agents." *Id.* at 425 (emphasis added), quoting *Jacobson v. United States, supra* at ——, 112 S.Ct. at 1540. To meet this burden, the lead opinion focuses on three factors.

In order to put the facts of this case in context when considering these three factors more closely, it will be helpful at this point to pause to consider the facts in *Sherman v. United States, supra*—a case in which the Supreme Court held that the Government had entrapped the defendant—for the facts there were markedly similar to those presented here.

In *Sherman,* an unpaid government informant met the defendant at a doctor's office where apparently both were being treated for narcotics addiction. After making a number of requests, the informant finally talked the defendant into obtaining and selling narcotics to him, predicated on the informant's claimed suffering from not being able to respond to treatment. Several times thereafter, the defendant used the informant's purchase money to buy drugs not only for the informant but also for himself, as well as to pay for a taxi and other expenses related to obtaining the drugs. The informant then told Bureau of Narcotics agents about these events, and they later observed the defendant sell narcotics to the informant on three occasions. The agent in charge of the case "never bothered to question" the informant about how "he had made contact with" the defendant in the first place.

At the outset, as noted earlier, the Supreme Court held that the Government could not make use of this informant (even though he was unpaid) "and then claim disassociation through ignorance." 356 U.S. at 375, 78 S.Ct. at 822. Without any consideration at all of the *Sherman* holding in this regard, the lead opinion in this case holds to the contrary, even though without doubt Powell was a *registered, paid* informant (receiving $75.00 for his first buy from appellant and $100.00 for his second one) who, though regrettably untethered to a law enforcement agent, was a player in their drug enforcement program.

Moreover, in weighing the facts to consider whether the Government had carried its burden on the entrapment issue, the Supreme Court—unlike each of our col-

leagues in the majority here—placed no distinction in the fact that the defendant had been asked to *sell* drugs, not to *use* them. The Supreme Court did point out, though, that the government-instigated sales to the informant had sadly induced the defendant to return to his old habit. *Id.* at 373, 78 S.Ct. at 821.

With this foundation, we can proceed to consider the three bases for the lead opinion's holding that the Government here proved beyond a reasonable doubt that appellant was disposed to sell drugs before the initial contact by Powell.

First, "There was evidence that appellant had used and sold cocaine in the past." 35 MJ at 425. We do not know what this supposed "evidence" is that appellant had sold drugs earlier: Powell expressly eschewed such knowledge. Possibly, the lead opinion is referring to appellant's conversational mention while in the car with Powell and Dupperon that he used to sell drugs in Panama. If so, that is a flimsy prop on which to build a conclusion of predisposition beyond a reasonable doubt.

Appellant was last stationed in Panama 5 years before this incident. Since then, of course, appellant had voluntarily enrolled in the rehabilitation program that he was in when Powell illegally approached him. As an outpatient in that program, he had come up "negative" on his previous 11 drug tests after miserably failing all prior efforts at rehabilitation. *See* 33 MJ at 357 n.3.

The prosecution in *Sherman*, too, attempted to show predisposition by introducing dated drug activity of the defendant—there, a 9–year–old conviction for selling narcotics and a 5–year–old conviction for possession of narcotics. The Supreme Court held that such evidence was not sufficient to prove the defendant had a predisposition to sell narcotics at the time that the informant approached him, "particularly when we must assume from the record he was trying to overcome the narcotics habit at the time." *Sherman v. United States, supra* at 375–76, 78 S.Ct. at 822. The Court further noted that "[l]aw enforcement does not require methods" in

which "the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted." *Id.* at 376, 78 S.Ct. at 822.

In other words, just like the defendant in *Sherman*, at the time appellant was lured into his crimes, he was attempting to overcome his addiction, and his drug distributions in Panama 5 years earlier, if they occurred at all, offered no proof that he was predisposed to distribute drugs at the time he was targeted.

Second, the lead opinion concludes that it was not very difficult for the Government to induce appellant into distributing drugs. The lead opinion contends that, "depending on whose testimony you accept, there was either a single invitation to distribute drugs or three invitations within a short period of time; and the invitation was accepted by appellant." 35 MJ at 425. *See United States v. Suter*, 21 USCMA 510, 515, 45 CMR 284, 289 (1972). Yet, Judge Cox, in the lead opinion on the initial appeal, stated:

> Powell then contacted appellant, asking if he knew where he (Powell) could get some drugs. Appellant responded negatively, stating he was not "using" drugs and was not "doing anything else." *However, Powell continued calling.... Appellant finally agreed to help Powell.*

33 MJ at 357 (emphasis added). The fact of this repeated calling is fully supported by Powell's testimony in the record.

Furthermore, in the context of the unusual circumstances of this case, this factor is not probative of appellant's predisposition, independent of the Government's acts, to distribute drugs. We do not consider the fact that an admitted drug addict who then is in a government-sponsored drug-rehabilitation program "finally agreed" to an old friend's "continued" imploring for help in the friend's quest for drugs to equate to "simply provid[ing] appellant] with the opportunity to commit a crime." *See Jacobson v. United States, supra* at ——, 112 S.Ct. at 1541.

Third, "at least on one occasion, appellant indicated that he would like his profit and showed his willingness to buy other drugs for the government agent anytime before his wife's arrival." 35 MJ at 425. In fact, appellant received no profit, and there was no evidence that he had taken a cut of the drugs for himself. After the second distribution, appellant did ask for—but did not receive—$20.00 for his services in this $500.00 transaction. By comparison, the defendant in *Sherman* had used more of the informant's money than was necessary to buy the drugs and then had used the money to support his own just-renewed drug use. The Supreme Court did not view these facts as demonstrating a profit motive. Cooper's activities do not extend nearly this far. As in *Sherman,* the evil of pulling appellant back into the drug environment is readily apparent, regardless whether the inducement was to use or to distribute drugs.

Furthermore, by the time appellant made his unfulfilled request for $20.00, the die was cast: The Government—without *any* pre-investigation basis to believe that appellant, then doing his best to extricate himself from the drug culture that had all but broken his life, was in any way involved with drugs—had succeeded in dragging him back into that bedeviled environment via the surreptitious pleas of his friend *from* that environment.

In short, then, we cannot agree that the prosecution has "prove[d] beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *See Jacobson v. United States, supra* at ——, 112 S.Ct. at 1540. None of the lead opinion's three bases individually nor all of them collectively shows beyond reasonable doubt that appellant "possessed the requisite predisposition prior to the Government's investigation and that it existed independent of" the reprehensible timing and nature of the Government's approach of appellant. *See id.* at ——, 112 S.Ct. at 1543. Instead, we conclude that, in this case, "the Government play[ed] on the weaknesses of an innocent party and beguile[d] him into committing crimes which he otherwise would not have attempted." *Sherman v. United States, supra* at 376, 78 S.Ct. at 822, quoted in *Jacobson v. United States, supra* at ——, 112 S.Ct. at 1543 (footnote omitted). Accordingly, we dissent.